No. 109,111

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CITY OF NEODESHA, KANSAS,
Individually and as Representative of Those Persons and Entities Similarly Situated,
*Appellants*,

v.

BP CORPORATION NORTH AMERICA,
INCORPORATED, f/k/a BP
AMOCO CORPORATION, *et al.*,
*Appellees.*

SYLLABUS BY THE COURT

1.

K.S.A. 2012 Supp. 60-250(a) allows a trial court to enter judgment as a matter of law against a party when the court finds there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. When ruling on such motions the trial court must resolve all facts and inferences reasonably drawn from the facts in favor of the party against whom the ruling is sought. If reasonable minds could reach different verdicts based on the evidence, the motion must be denied. An appellate court must undertake a similar analysis when reviewing the ruling on such a motion.

2.

Under Supreme Court Rule 181 (2013 Kan. Ct. R. Annot. 277), a juror may be called to testify at a hearing on a posttrial motion only if the court—after a hearing to determine whether all or any jurors should be called—grants a motion to call the juror.

3.

K.S.A. 2012 Supp. 60-259(a)(1)(C) grants the trial court authority to order a new trial when the jury verdict was given under the influence of passion or prejudice.

1

**4.**

An appellate court reviews the trial court's decision on a motion for a new trial for an abuse of discretion.

**5.**

If jury misconduct causes a fundamental failure of the trial process that is substantially prejudicial to the complaining party, the trial court may order a new trial.

**6.**

An appellate court will use a two-step process in determining whether a challenged jury instruction is clearly erroneous. First, the court must determine whether there was any error at all by considering whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record. If the court finds error, it must assess whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming error in the instruction has the burden to prove the degree of prejudice necessary for reversal.

**7.**

The trial court is required to properly instruct the jury on a party's theory of the case. Errors regarding jury instructions will not require reversal unless they result in prejudice to the appealing party. Instructions in any particular case are to be considered together and read as a whole, and where they fairly instruct the jury on the law governing the case, error in an isolated instruction may be disregarded as harmless. If the instructions are substantially correct and the jury could not reasonably have been misled by them, the instructions will be approved on appeal.

**8.**

It is the appellant's burden to designate the record to establish any claim of error. Without a record, this court will not presume error.

**9.**

When the trial court denies a motion in limine and the subject evidence is introduced later at trial, the moving party must object at trial to the admission of the evidence in order to preserve the issue for appeal.

**10.**

K.S.A. 60-404 generally precludes an appellate court from reviewing an evidentiary challenge unless there appears of record an objection to the evidence, timely interposed, and so stated as to make clear the specific ground of objection.

**11.**

Under K.S.A. 2012 Supp. 60-226(b)(4), documents prepared in anticipation of litigation or for trial by or for a party are not discoverable by another party in the absence of some specific showing of need. The work-product rule is not an absolute privilege but rather a limitation on discovery.

**12.**

K.S.A. 60-456(a) states that if a witness is not testifying as an expert, his or her testimony in the form of opinions or inferences is limited to such opinions or inferences the judge finds (a) may be rationally based on the perception of the witness and (b) are helpful to a clear understanding of his or her testimony. This statute permits opinion testimony by a nonexpert witness if the opinion is incidental to the witness' actual knowledge of the facts and circumstances of the case.

**13.**

The qualification of an expert witness and the admission of that witness' testimony are matters within the broad discretion of the trial court.

14.

Failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue.

15.

Sanctions should be designed to accomplish the objectives of discovery rather than for the purpose of punishment. The dismissal or granting of a default judgment is a drastic remedy to impose as a discovery sanction and should be used as a last resort when other lesser sanctions are clearly insufficient to accomplish the desired outcome.

Appeal from Wilson District Court; DANIEL D. CREITZ, judge. Opinion filed August 22, 2014. Affirmed.

*David W. Edgar*, of Edgar Law Firm LLC, of Denver, Colorado, *John M. Edgar, John F. Edgar*, and *Matthew J. Limoli*, of Kansas City, Missouri, and *James P. Frickleton*, of Bartimus, Frickleton, Robertson & Gorny, P.C., of Leawood, for appellants.

*Richard C. Hite*, *Arthur S. Chalmers*, and *F. James Robinson, Jr.*, of Hite, Fanning & Honeyman, L.L.P., of Wichita, and *Richard C. Godfrey, Andrew B. Bloomer, Catherine L. Fitzpatrick, Michael Chu, and Megan M. New*, of Kirkland & Ellis, LLP, of Chicago, Illinois, for appellees.

Before HILL, P.J., ATCHESON and BRUNS, JJ.

HILL, J.: Everything in our world moves. This means the pollutants and poisons produced by a century of oil refining rarely stay in one place, safely secured in some snug unseen underground cell. Instead, such noxious compounds slowly migrate, leaching from one substratum to another. No neighbor is safe from this march of toxins. These moving subsurface fields of pollution, euphemistically called "plumes" by some, are dangerous for these feathers are toxic.

4

Fortunately, what is done by human effort can be, for the most part, undone by human effort. Messes can be cleaned up. Pollutants, even those buried deep below the surface, unseen but nonetheless lethal, can be diverted, contained, and reduced. When engaged in such efforts, questions arise. Is there pollution at this site? If so, what are the pollutants and how extensive is the danger? What can be done to protect the public? Finally, who is going to pay for these measures?

When a group of citizens, some businesses, and two local governments sued BP Corporation North America (BP), a company that owns a closed oil refinery in Neodesha, Kansas, they sought answers to those questions. After a 17-week jury trial, the jury determined that BP was not legally responsible to do more than what it was already doing.

In an interlocutory appeal of the trial court's posttrial order granting a new trial to the Plaintiffs on the theory of strict liability, the Kansas Supreme Court reversed, holding the Plaintiffs were not entitled to a new trial on that theory. Upon the case's return to the district court, the Plaintiffs moved for a new trial for many reasons. This appeal arises from the trial court's denial of that motion.

HISTORICAL BACKGROUND

When the Supreme Court reviewed this case, the court offered a detailed history, beginning in 1897, of the background of this growing environmental problem. We need not repeat all of those facts here. See *City of Neodesha v. BP Corporation*, 295 Kan. 298, 300-02, 287 P.3d 214 (2014) (*Neodesha I*).

In late 2002, certain city officials began questioning BP's remediation efforts. Several officials and citizens visited Sugar Creek, Missouri, another site where BP had

5

been remediating wastes from a former refinery. It was at this time the City of Neodesha (the City) retained the services of the Technical Outreach Services for Communities (TOSC) group, an advisory group from Kansas State University, to review BP and Kansas Department of Health and Environment materials and educate the City about the issues.

In the summer of 2003, an advisory group composed of various representatives of Neodesha industry, citizenry, and governmental entities held meetings with BP and Department of Health and Environment officials concerning the environmental conditions around the old refinery. The group unanimously approved BP's proposed "Corrective Action Study" that created a detailed cleanup plan. About that same time, Neodesha's mayor and city administrator requested that BP provide financial "reinvestments" within the City that did not directly tie into the ongoing remediation work. In light of the City's request, BP formed a working group in an effort to negotiate a settlement. When subsequent negotiations failed, this lawsuit followed.

THIS LAWSUIT WAS LARGE IN SCOPE.

In March 2004, the City filed this action on behalf of itself and all other real property owners in Neodesha. The trial court granted the Plaintiffs' motion for class certification, defining the class as "[a]ll persons and entities who owned real property on or after March 19, 2004, which has been exposed to or otherwise suffered economic harm from the hazardous wastes released from the [BP] operations in and around Neodesha, Kansas." Although the Plaintiffs' petition was amended several times, the allegations against BP ultimately included claims of negligence, strict liability, nuisance, trespass, violation of K.S.A. 65-6203 (a statute creating legal liability for accidental release or discharge of materials detrimental to water or soil), unjust enrichment, fraudulent concealment/fraud by silence, breach of fiduciary duty, and breach of contract. The Plaintiffs also sought declaratory and injunctive relief.

6

The Plaintiffs based their claims on allegations that BP and its predecessors released petroleum, petroleum products, and hazardous substances into the soil and groundwater from the refinery which was located within the city. The Plaintiffs also claimed that BP had failed to adequately remediate the damages created by its contamination.

The trial court granted summary judgment to BP on some issues. It ruled that the Plaintiffs could not pursue an unjust enrichment claim and that the statute of repose barred any claims regarding what had occurred when the refinery was operational.

After a 17-week trial, the jury returned a verdict in favor of BP on all counts. The Plaintiffs alleged many trial errors and jury misconduct. They sought a new trial. The trial court denied these motions. But, the trial court did grant the Plaintiffs' motion for judgment as a matter of law on their strict liability claim. Our Supreme Court later overturned this ruling in *Neodesha I*, 295 Kan. 298. The Court ruled: "Strict liability claims in tort alleging water contamination require application of the abnormally dangerous activity tests set forth in Restatement (Second) of Torts §§ 519 and 520 (1976). Language to the contrary in *Koger v. Ferrin*, 23 Kan. App. 2d 47, 926 P.2d 680 (1996), is disapproved." After the mandate from the Supreme Court arrived at the district court, the court entered judgment in favor of BP on the strict liability claim and affirmed its prior denials of the Plaintiffs' other posttrial motions.

We see three categories of attack by the Plaintiffs on the trial court's judgments. First, the court made many errors in its legal rulings. Next, the court failed to fully investigate the Plaintiffs' claims of jury misconduct. And finally, the court abused its discretion in many ways during and after the trial.

Naturally, after such a long trial, we must cope with a huge record on appeal and many allegations of error. There are 203 volumes in the record on appeal, with 70

7

volumes of transcripts of the jury trial and more than 1,000 exhibits. We will first examine the various legal rulings that the Plaintiffs complain about. Next, we will review the question of possible jury misconduct. Finally, we will look at the many discretionary rulings made by the trial court that are the grounds for the Plaintiffs' request for a new trial. We cannot conclude that this was a perfect trial, but we see no good reason to conclude that the court should have granted a new trial.

THE PLAINTIFFS ARGUE THAT BP IS STRICTLY LIABLE.

Citing the "abnormally dangerous activity" standard mentioned by the Supreme Court in *Neodesha I*, the Plaintiffs contend the undisputed facts establish that BP's ongoing storage of hazardous and carcinogenic pollutants on its property is abnormally dangerous. Therefore, the Plaintiffs claim the trial court erred in not granting their motion for judgment as a matter of law on this theory.

Indeed, K.S.A. 2012 Supp. 60-250(a) allows a trial court to enter judgment as a matter of law against a party when the court finds there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. When ruling on such motions the trial court must resolve all facts and inferences reasonably drawn from the evidence in favor of the party against whom the ruling is sought. If reasonable minds could reach different verdicts based on the evidence, the motion must be denied. We, as an appellate court, must undertake a similar analysis when reviewing the ruling on such a motion. *Neodesha I*, 295 Kan. at 319.

In its response, BP argues that the law-of-the-case doctrine prevents our review of this issue. The law-of-the-case doctrine prevents relitigation of the same issues within successive stages of the same lawsuit. *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, 1212, 308 P.3d 1238 (2013). This doctrine is similar to collateral estoppel. Collateral estoppel prevents parties from relitigating an issue a court has

8

decided on the merits in another action. *Estate of Belden v. Brown County*, 46 Kan. App. 2d 247, 266, 261 P.3d 943 (2011). The law-of-the-case doctrine serves essentially the same function within a single case on issues a court has considered and decided. *State v. West*, 46 Kan. App. 2d 732, 735-36, 281 P.3d 529 (2011).

In order to rule on this matter, we must review some case history. Each of the Plaintiffs' petitions and amended petitions contained a strict liability count. Essentially, the petitions alleged that BP allowed contamination from its property to escape and that because the treatment and storage of the contaminants were not matters of common usage and the activity was inappropriate for the location, it was an abnormally dangerous activity and thus BP was strictly liable. The final pretrial order contained a strict liability claim based on BP's alleged pollution of ground water and for engaging in abnormally dangerous activities in the storage and treatment of the refinery contamination.

Prior to trial, BP argued that the 2-year statute of limitations and the 10-year statute of repose barred the Plaintiffs' strict liability claims. BP argued that any claims based upon activities relating to plant operations which terminated in 1970 or for other events prior to March 19, 2002, were legally barred. BP also argued in the alternative that the disposal of wastes on the plant's property was not an abnormally dangerous activity as defined by the Restatement (Second) of Torts §§ 519-520 as adopted in Kansas.

Just before trial, the trial court partially granted BP's summary judgment motion on these issues. The court rejected BP's assertions that the statute of repose and the statute of limitations completely barred the Plaintiffs' strict liability claims. The court held that the statute of repose barred a portion of the Plaintiffs' claims—to the extent they related to discontinued refinery operations. But the court ruled that it was a question for the jury to decide whether BP was strictly liable for its management of the remediation project and that such liability would be "'limited to the kind of harm the possibility of which makes the activity abnormally dangerous.' [Citation omitted.]." The trial court also

9

found that there were questions of fact on whether BP was estopped from asserting the 2-year statute of limitations with respect to its remediation efforts. Finally, the court held that a "strict liability" analysis was still applicable in cases involving contamination of water.

Accordingly, the trial court instructed the jury on the strict liability claim. In the general claims instruction, the court told the jury that the Plaintiffs claimed BP was strictly liable "for [its] clean up of the refinery contamination." The court gave a special instruction on strict liability that stated the Plaintiffs were required to prove BP's remediation constituted an "abnormally dangerous activity" and listed the various factors used to consider whether an activity is abnormally dangerous.

It is important at this point to review what the Supreme Court stated on this issue in *Neodesha I*:

"[T]he general rule imposing strict liability in tort law for abnormally dangerous activities stated in the Restatement (Second) of Torts § 519 provides: (a) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land, or chattels of another resulting from the activity, although he or she has exercised the utmost care to prevent the harm; and (b) this strict liability is limited to the kind of harm the possibility of which makes the activity abnormally dangerous.

"In determining whether an activity may be determined abnormally dangerous, the Restatement (Second) of Torts § 520 sets forth the following factors: (a) existence of a high degree of risk of some harm to the person, land, or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes." 295 Kan. at 318-19.

Of course, after hearing all of the evidence the jury returned a verdict finding BP was not liable to the Plaintiffs under a strict liability claim or any other claim.

With all of this in mind, the Plaintiffs are precluded from asserting they are entitled to judgment as a matter of law under an abnormally dangerous activity theory. The Plaintiffs never sought judgment as a matter of law in the district court under the abnormally dangerous activities standard. Both in their pre- and postverdict motions their arguments were based solely on their perception that Kansas law created a per se liability for contamination of groundwater. Neither motion addressed the Restatement (Second) of Torts factors for abnormally dangerous activities. We cannot say the trial court erred in denying a motion under K.S.A. 2012 Supp. 60-250 on a theory that the Plaintiffs never asserted.

We must also point out that after the trial court received the mandate in *Neodesha I*, the Plaintiffs did not file a new motion based upon the abnormally dangerous standard. We can find nothing in the record that reveals the Plaintiffs filed any motion reiterating the alternative basis for strict liability in applying the trial evidence to the Restatement (Second) of Torts standards. It appears the Plaintiffs have improperly tried to raise this issue for the first time on appeal. See *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011).

Finally, the Supreme Court reviewed the trial evidence and found that disputed facts existed with regard to the abnormally dangerous activity issue. As a result, the court found the jury's verdict rejecting the strict liability theory should not be disturbed. *Neodesha I*, 295 Kan. at 325. Thus, the Supreme Court's determination that the facts on the issue were disputed is the law of the case, and that determination cannot be challenged in this appeal. The Plaintiffs fail to cite any explicit testimony from the trial that established, as a matter of law, that the factors relating to the abnormally dangerous activity were proved as a matter of law.

11

We see no reason to reverse on this issue.

## THE TRIAL COURT DID NOT NEED TO RECALL THE ENTIRE JURY.

The Plaintiffs contend that the trial court failed to properly investigate their claims of jury misconduct by refusing to recall the entire jury panel. The Plaintiffs also claim the trial court abused its discretion in denying their motion for a new trial as a result of jury misconduct.

Indeed, under Supreme Court Rule 181 (2013 Kan. Ct. R. Annot. 277) a juror may be called to testify at a hearing on a posttrial motion only if the court—after a hearing to determine whether all or any jurors should be called—grants a motion to call the juror. And K.S.A. 2012 Supp. 60-259(a)(1)(C) grants the trial court authority to order a new trial when the jury verdict was given under the influence of passion or prejudice. In fact, jurors cannot be called for hearings on posttrial motions without an order of the court that is entered after a motion and a Rule 181 hearing. *Williams v. Lawton*, 288 Kan. 768, Syl. ¶ 10, 207 P.3d 1027 (2009).

We review the trial court's decision on a motion for a new trial for an abuse of discretion. *Duncan v. West Wichita Family Physicians,* 43 Kan. App. 2d 111, 114, 221 P.3d 630 (2010), *rev. denied* 291 Kan. 910 (2011). A judicial act constitutes an abuse of discretion if the action is: (1) arbitrary, fanciful, or unreasonable—*i.e.*, if no reasonable person would take the view adopted by the trial court; (2) based on an error of law—*i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact—*i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

Recalling jurors after their service has ended is not common and should be undertaken only for just cause. *Williams*, 288 Kan. at 788.

In 1915, the United States Supreme Court explained the important policy considerations that made shielding jury deliberations from public scrutiny a necessity.

"[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference." *McDonald v. Pless*, 238 U.S. 264, 267-68, 35 S. Ct. 783, 59 L. Ed. 1300 (1915).

Later, the Supreme Court described the well-established common-law rule.

"By the beginning of this century, if not earlier, the near-universal and firmly established common-law rule in the United State flatly prohibited the admission of juror testimony to impeach a jury verdict. . . .

"Exceptions to the common-law rule were recognized only in situations in which an 'extraneous influence' [citation omitted] was alleged to have affected the jury." *Tanner v. United States*, 483 U.S. 107, 117, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987).

If jury misconduct causes a fundamental failure of the trial process that is substantially prejudicial to the complaining party, the trial court abuses its discretion if it fails to order a new trial. See *Bell v. State*, 46 Kan. App. 2d 488, 490-91, 263 P.3d 840 (2011), *rev. denied* 296 Kan. 1129 (2012).

When ruling on motions such as this, a court must follow two statutes, K.S.A. 60-441 and K.S.A. 60-444. The first, K.S.A. 60-441, bars the receipt of evidence that shows the effect of any statement, conduct, event, or condition upon the mind of a juror as an influence on his or her verdict or as it concerns the mental processes by which the verdict was determined. In other words jurors cannot be compelled to relate their thought processes. But the second, K.S.A. 60-444, permits a juror to testify about the conditions or occurrences either within or outside of the jury room having a material bearing on the validity of the verdict. This would permit evidence of any "extraneous influence," as mentioned by the United States Supreme Court, to come to light. See *Tanner*, 483 U.S. at 117.

HOW THIS ISSUE AROSE

These concerns came to the trial court's attention when the Neodesha city administrator filed an affidavit that stated he had been approached shortly after the trial by Juror No. 11 who disagreed with the verdict and asserted that some of the jurors denied others the ability to review the exhibits during deliberations. Another representative of the Plaintiffs met Juror No. 2 at a local store, and Juror No. 2 told the representative that the jury did not discuss or review the evidence during deliberations and the votes on one of the claims changed over the holiday break from a verdict for the Plaintiffs to a defense verdict.

Over BP's objections, the trial judge interviewed Juror No. 11 in the presence of a court reporter. Juror No. 11 mostly confirmed the administrator's affidavit and told the judge that she believed four jurors bullied others by wanting to constantly vote on the claims, "shoot[ing] down" anyone who expressed a different viewpoint, and rushing jurors who wished to look at exhibits during the discussions. Juror No. 11 told the judge she simply told them to shut up and leave her alone while she was looking at the exhibits. Juror No. 11 stated she was bolder than others and did what she thought was right. Juror

14

No. 11 also reported that on the first 2 days of deliberations they had gone through the verdict form down to the nuisance claim; at that time, a poll of the jurors resulted in a majority voting to award the Plaintiffs damages on that claim. When the jurors returned from the holiday break several days later, one or more jurors expressed uncertainty over that claim, and they decided to go back over the question. The vote then changed to a 10-2 verdict for BP. Still, Juror No. 11 indicated that the verdict affirmed at the end of the trial was correct and that 10 or more persons voted in favor of BP on every claim.

After all of this came to light, the trial judge conducted similar interviews with Jurors Nos. 1, 2, and 7. All three of those jurors told the judge they remembered being polled after the verdict was announced and agreed that 10 or more jurors agreed on the verdicts. Although not every issue was unanimous, they still affirmed during the interviews that the verdict read was a correct reflection of their votes.

These three jurors all agreed that every juror had the opportunity to look at the exhibits, although other jurors did not want them to take too long and stall the process. The three jurors agreed that several jurors had agreed in favor of the Plaintiffs on the nuisance or trespass issue, but some of the jurors' views changed after the holiday break. After the break, the vote was 10 or more again voting for a defense verdict on that claim. All three agreed the jurors discussed the evidence and any juror who wanted to say something was allowed to do so. Further, the jury panel discussed the instructions and the verdict form during this process, even though they did not always agree. No one in the jury room used abusive language or personally attacked another juror. None of these jurors had any reason to believe other jurors ignored the judge's admonishment not to discuss the issues over the break. No matters outside the evidence were discussed.

Finally, none of these jurors felt coerced, although Juror No. 1 asserted that whatever viewpoint she raised, the majority always seemed to reject it and she believed other jurors were very strong in their viewpoint and could have overpowered weaker

15

jurors. Some of the jurors made negative remarks about the Plaintiffs' counsel, seeing him as a bully.

The trial court provided copies of the transcripts from the juror interviews to counsel for both sides, and counsel had the opportunity to review those transcripts before the scheduled hearings on the Plaintiffs' posttrial motions when this issue was argued.

On the day before the hearing on the Plaintiffs' posttrial motion, the Plaintiffs filed a motion seeking to withdraw their motion to recall the entire jury. The Plaintiffs gave no reason why they were withdrawing the motion. At the hearing, the Plaintiffs' counsel was asked if this was a waiver of the entire issue. In response he stated:

> "Your Honor, the pleading is as the pleading states, we are withdrawing our 181 motion. We recognize the Court's admonition in which the Court indicated it would not grant a motion on—based on the affidavits and things that had gone before without a pursuit of a 181 motion. So we were acknowledging that section II-E of our amended new trial motion goes to that issue. Just acknowledging for the benefit of the Court and benefit of the other side that we therefore would not burden the Court with any argument on that issue, the Court having already indicated its intent. But that is the extent of what we intended to do by that sentence."

Accordingly, the Plaintiffs did not argue jury misconduct during that hearing. After the hearing, even though the Plaintiffs had withdrawn their motion to recall the jury, the trial court addressed that issue in its order. The court denied any relief, finding the Plaintiffs did not carry their burden of proving just cause to recall the entire jury in light of the jurors' affidavits presented by both parties. Although the court noted that it did not consider the transcripts of the ex parte interviews with the jurors, the judge indicated he would have reached the same conclusion even if he had considered the interviews. The court also separately addressed and rejected the concerns of juror misconduct in connection with Juror No. 9.

16

To us, the Plaintiffs contend the trial court erred in failing to carry out its duty to fairly investigate allegations of jury misconduct. They base their contention on three points: (1) Juror No. 9 and perhaps others prejudged the case; (2) the jury suddenly changed directions after the holiday recess; and (3) dissenting jurors were bullied into submission to a defense verdict.

Our review of the record does not support any of the Plaintiffs' assertions. We note that there are no allegations of any outside influence on this jury. All of these complaints are about how this jury conducted its deliberations and not some outside interference or extraneous matter that would influence their verdict.

The trial court did conduct ex parte interviews with four of the jurors and later accepted juror affidavits from both parties. Significantly, the Plaintiffs withdrew their motion to recall the jury on the eve of the arguments on posttrial motions. We can only view this as a deliberate trial strategy chosen by counsel after consulting with the Plaintiffs. Even though the court addressed the Rule 181 motion in its ruling, the Plaintiffs cannot complain the trial court erred in failing to recall the jury when they withdrew that request. A party may not invite error and then complain of that error on appeal. *Thoroughbred Assocs.*, 297 Kan. at 1204. For this reason, we reject this point on appeal.

Besides, the trial court here found that there was simply not enough evidence to conclude the Defendants' verdict was impeached by these allegations. A panel of this court noted that, especially in long trials, jurors will continue to act as human beings:

> "'[T]he jury being what it is, jurors will act like human beings in the jury room, and will indulge in bluster and hyperbole and animated irrelevancies. Not only does the law presume a juror respects the obligation of his oath and votes his convictions, but generally he in fact does so; and due allowance must be made for some exuberance in

17

jury-room discussion or the court must keep on granting new trials in important cases until a perfectly spiritless jury can be secured.' [Citation omitted.]" *Butler v. HCA Health Svcs. of Kansas, Inc.*, 27 Kan. App. 2d 403, 412, 6 P.3d 871, *rev. denied* 268 Kan. 885 (1999).

Further on this point, "[a]n attempt to persuade a person to vote differently than he or she feels may seem somewhat coercive, but an attempt to convince a minority member of the jury of the error of a position, while perhaps uncomfortable for the minority member, does not constitute juror misconduct." *State v. Jones*, 29 Kan. App. 2d 936, 940, 34 P.3d 82 (2001), *rev. denied* 273 Kan. 1038 (2002).

Based on this record and the trial judge's firsthand experience during the trial and its aftermath, there is no clear evidence for us to conclude that there was any misconduct by the jurors that was prejudicial to the Plaintiffs. We see no reason to order a new trial based on jury misconduct. We see no fundamental failure in the trial based on jury misconduct. There is no substantial prejudice here to the Plaintiffs' right to a fair trial.

WE TURN TO CLAIMS OF JURY INSTRUCTION ERRORS.

The Plaintiffs pursued eight different legal theories on behalf of a broad assortment of subclasses in this trial. The Supreme Court in *Neodesha I* commented that the jury instructions in this case were somewhat inconsistent and confusing. We agree. Overall, most of the objections concerning the instructions that the Plaintiffs now raise in their brief were not lodged at trial. This means, ultimately, we must review this issue under a clearly erroneous standard. After careful consideration we are not persuaded that a new trial is called for based upon errors in the instructions.

Caselaw instructs that for jury instruction issues, the standards of review on appeal differ as our analysis progresses:

18

- First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review;

- next, the court should use an unlimited review to determine whether the instruction was legally appropriate;

- then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the requesting party, that would have supported the instruction; and

- finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test set forth in *Ward*, 292 Kan. at 550; *Foster v. Klaumann*, 296 Kan. 295, 301-02, 294 P.3d 223 (2013).

Importantly, a party must object to the trial court's giving of or failing to give a jury instruction before the jury retires. K.S.A. 2012 Supp. 60-251(c). The party must state clearly what matter is objectionable and give the legal grounds for the objection. Otherwise, a court may only consider an error in the giving or the failure to give the instruction if the instruction is clearly erroneous and the error affects substantial rights. K.S.A. 2012 Supp. 60-251(d)(2).

An appellate court will use a two-step process in determining whether the challenged jury instruction is clearly erroneous. First, the court must determine whether there was any error at all by considering whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record. If the court finds error, it must assess whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming error in the instruction has the burden to prove the degree of prejudice necessary for reversal. See *State v. Smyser*, 297 Kan. 199, 204, 299 P.3d 309 (2013). Therefore, because the

19

Plaintiffs allege instruction error, it is their burden to prove the degree of prejudice necessary for reversal in this case. They have failed to do so.

We will now review the general claims instruction that the Plaintiffs complain about and then move on to the instructions covering negligence, strict liability, public and private nuisance, trespass, and claims made under K.S.A. 65-6203.

*Instruction No. 4—the claims instruction*

Primarily, the Plaintiffs complain that Instruction No. 4, the general claims instruction, did not use the exact language the Plaintiffs used in their claims statement found in the final pretrial order. The Plaintiffs renewed this objection concerning other theories of recovery as well.

Instruction No. 4 stated in part:  "Defendants were negligent by failing to use the necessary care in the clean up of the refinery contamination . . . ." In their brief, the Plaintiffs argue that because the instruction did not contain the word "investigate" as the pretrial order did, the court failed to fully describe their claim to the jury, and that is reversible error.

Although the Plaintiffs proposed a more detailed claims instruction during the instruction conference, their counsel only objected to the trial court's use of the term "remediation" rather than "clean up" in Instruction No. 4. In response, at the Plaintiffs' request, the court changed the word "remediation" to "clean up" throughout Instruction No. 4, including the portion of the contention instruction relating to negligence. The Plaintiffs made no request to the court to include the phrase "investigate and clean up."

In fact, the Plaintiffs specifically objected to BP's arguments that "clean up" was too vague, inconsistent with the pretrial order, and raised concerns relating to the trial

20

court's ruling on the statute of repose. During this argument, the Plaintiffs emphasized that the heart of the case was not remediation, but BP's failure to clean up. Again, counsel did not mention "investigate." In short, Instruction No. 4 complied with all requests the Plaintiffs made in the instruction conference. We see no legal significance to the Plaintiffs' complaint about failing to include the term investigate in the general claims instruction.

We will deal with the additional complaints about Instruction No. 4 as we proceed with the specific instructions dealing with the specific claims.

*Instruction No. 8—negligence*

In this instruction, the trial court began: "In performing professional services, the party undertaking to remediate has a duty to use that degree of care and skill which would be used by a reasonably competent professional providing similar services in the same community and acting in similar circumstances." Clearly, the court used the phrase "undertaking to remediate" instead of the Plaintiffs' proposed instruction that used "undertaking to investigate and remediate."

During the instruction conference, the Plaintiffs objected to the use of the word "remediate" but made no mention of the word "investigate." In addressing the use of the term "remediate," the trial court acknowledged that the Plaintiffs could argue about the inadequacy of the remediation efforts and that was proper argument.

With this record, we hold that the Plaintiffs failed to adequately object to these instructions. We therefore must review them using a clearly erroneous standard of review, later.

21

*Instruction No. 9—strict liability*

The Plaintiffs make a similar complaint that the pertinent section of Instruction No. 4 failed to adequately define their strict liability claim because it did not use the language used in the final pretrial order. Instruction No. 4 advised the jury: "The Plaintiff Class claims that it sustained damages stemming from Defendants' failure to clean up the refinery contamination in Neodesha. Specifically, Plaintiff Class claims: . . . (2) Defendants are strictly liable to the Plaintiff Class for their clean up of the refinery contamination."

The Plaintiffs' proposed instruction read: "Defendants are strictly liable for having polluted groundwater as a result of their *storage and treatment* of the BP contamination." (Emphasis added.)

Again, during the instruction conference, the Plaintiffs' counsel stated: "Defendants are strictly liable to plaintiffs' class for their failure to clean up the refinery contamination." There was no mention of storage at this point. The judge drafted the instruction as requested. It seems to us, therefore, that the doctrine of invited error bars the Plaintiffs from challenging this aspect of Instruction No. 4. See *Fleetwood Folding Trailers v. Coleman Co.*, 38 Kan. App. 2d 30, 47, 161 P.3d 786 (2007).

We move on to the subject instruction, Instruction No. 9. In their brief, the Plaintiffs argue that BP was strictly liable for choosing not to look for additional contamination or address the contamination and, therefore, Instruction No. 9 was also erroneous. That instruction stated, in part:

"A person who engages in an abnormally dangerous activity is strictly liable for harm to the property of another resulting from the activity, although that person exercised the utmost care to prevent the harm. To establish liability based upon strict liability, the

22

Plaintiff Class must prove Defendants' remediation constituted an 'abnormally dangerous activity' as it relates to the Class."

When discussing Instruction No. 9 during the instruction conference, the Plaintiffs only objected to the use of the term "remediation" rather than "clean-up." The Plaintiffs expressed concern that the term "remediate" did not include BP's failure to find the rest of the pollution. The trial court overruled this objection. The Plaintiffs agreed to a change on the second page of the instruction when the court added language stating that "the Plaintiff Class must prove that the remediation *created a risk* that was so unusual . . . ." (Emphasis added.)

Finally, the Plaintiffs complain that the instruction was confusing because it contained both the factors from the Restatement (Second) of Torts as well as a strict liability standard. But we must point out that the Plaintiffs requested language stating that "Kansas law provides that this strict liability applies to conduct involving contamination of water resources because of the importance of clean, safe water." BP objected to the inclusion of the strict liability language, but the Plaintiffs did not. That language was taken from their proposed instructions. While they now claim it was confusing to place it in the instruction containing the Restatement's abnormally dangerous activities language, they made no such objection during the instruction conference. Thus, while the Supreme Court ultimately rejected this language from *Koger* concerning strict liability in *Neodesha I*, 295 Kan. 298, Syl. ¶ 8, 287 P.2d 214 (2012), it was included at the Plaintiffs' specific request and, therefore, the invited error doctrine prohibits the Plaintiffs from complaining about this portion of the instruction. See *Fleetwood Folding Trailers*, 38 Kan. App. 2d at 47.

These complaints boil down to this: The Plaintiffs' overall objection to Instruction No. 9 must be limited to whether the trial court's failure to include the term "investigate"

23

was reversible error. The Plaintiffs fail to explain how a "failure to investigate" constitutes an abnormally dangerous activity for which BP would be held strictly liable.

The statement given later in the same instruction—that the Plaintiffs must prove the remediation created a risk that was so unusual as to justify the imposition of strict liability for the harm that resulted from it—would be sufficient to address this concern. We hold this was not reversible error.

*Instructions Nos. 10 and 11—nuisance*

The Plaintiffs pursued public and private nuisance claims against BP. Instruction No. 10 dealt with private nuisance while No. 11 covered public nuisance.

Once again, they challenge Instruction No. 4's failure to mirror the exact language of the pretrial order. We are puzzled by this argument because the language used in Instruction No. 4 in describing this claim stated: "Defendants' spread of the contamination constitutes a nuisance." According to our reading of the record, the trial court changed the instruction at the Plaintiffs' request. Since the instruction mirrored the language requested during the instruction conference, any error in this language is invited. See *Fleetwood Folding Trailers,* 38 Kan. App. 2d at 47.

Moving on, we note that the Plaintiffs object to the language of Instruction No. 10 because the trial court used the term "remediation." The Instruction stated: " To establish liability based upon private nuisance, the Plaintiff Class must establish that Defendants' remediation substantially and unreasonably interfered with the use and enjoyment of the property of each and every member of the Plaintiff Class . . . ."

This language differed from the language in Instruction No. 4. The Plaintiffs argue that using the term "remediation," prevented the jury from considering the remediation

BP failed to undertake. Again, the Plaintiffs did not object to Instruction No. 10 other than seeking and receiving the clarification in the first paragraph that it was a "private" nuisance. In fact, other than arguing about clarification of the time qualification on the operation of the former refinery on the second page of the proposed instruction, the Plaintiffs had no other objections.

The instruction also advised the jury that the Plaintiffs must prove that "Defendants acted negligently in creating or maintaining the nuisance." A failure to remediate when there is a duty to remediate is negligence and is covered by this part of the instruction. We do not see this as a fatal flaw in Instruction No. 10.

Moving on, the Plaintiffs agree that Instruction No. 11, dealing with public nuisance, sets the correct legal standard. But, on appeal, they claim it is tainted by the error made in the claims instruction, Instruction No 4. The Plaintiffs did not object to Instruction No. 11 except when the trial court added language that the nuisance could not be based on the operation of the former refinery. Because the Plaintiffs' only objection to Instruction No. 4 resulted in the change they requested, we do not see how they can avoid the invited error doctrine on this instruction.

*Instruction No. 12—trespass*

The Plaintiffs' objections to the trespass instruction are consistent with their earlier complaints. Again, the Plaintiffs complain that Instruction No. 4 did not mirror the exact language set forth in the pretrial order. Here, however, the Plaintiffs assert that the trial court inadvertently directed a verdict for BP.

Once again, the Plaintiffs did not object to the trespass section of Instruction No. 4 during the instruction conference. In addition, the instruction stated that the class claimed "it sustained damages stemming from Defendants' failure to clean up the refinery

25

contamination in Neodesha. Specifically, the Plaintiff Class claims . . . (4) Defendants trespassed onto the Plaintiff Class' property." With no objection made, we will only review for clear error.

Instruction No. 12 told the jury: "A person who causes foreign matter to intrude upon the land of another is liable for trespass when that person acts knowing that such acts will, to a substantial certainty, result in foreign matter entering the land of another."

At one point in their brief, the Plaintiffs argue that this instruction could be confusing to the jury because employees from BP and its contractors frequently visited these affected properties. We are not persuaded that a rational juror would consider a human being as "foreign matter."

Additionally, the Plaintiffs did not object to Instruction No. 12 except for the time limitation referring to "operation of the former refinery." Therefore, on this point, based on the lack of contemporaneous objection, any error in the instruction must rise to the level of clear error before it can be reversible. We will address clear error later.

*Instruction No. 13—K.S.A. 65-6203 claims*

After repeating their challenge to Instruction No. 4's description of their claim as well as challenging Instruction No. 13, the Plaintiffs argue that the instructions, as given, effectively directed a verdict for BP on this claim. The statute in question, K.S.A. 65-6203, is a public health law making anyone who accidentally releases or discharges materials detrimental to the quality of the water or soil in this state responsible to the owner of the affected property for compensatory damages.

The pertinent portion of Instruction No. 4 stated: "Defendants' clean up violated K.S.A. 65-6203 by causing the release and discharge of the refinery contamination onto

26

the Plaintiffs' property." The trial court rewrote that section of Instruction No. 4 based on the Plaintiffs' requests. The Plaintiffs disputed the use of the term "clean-up" and requested it be changed to "spread of contamination," but the court found that to be nonsensical. The court did agree to change the instruction to "Defendants' failure to clean up violated 65-6203." Evidently, that change did not make it into the final draft, which still read that BP's cleanup violated the statute.

Moving on, the Plaintiffs make two challenges to Instruction No. 13. First, the Plaintiffs dispute the use of the term "remediation" in the introductory paragraph. That section states: "To establish liability under K.S.A. 65-6203 relating to discharge of materials from the remediation, the Plaintiff Class must prove . . . ."

The Plaintiffs also object to subparagraph (4) that states the Plaintiffs must show that any release occurred without contribution to the contamination by the owner or owner-permitted occupant. The Plaintiffs did not object to this portion of the instruction during the instruction conference. The Plaintiffs now argue that this subparagraph of the instruction introduces a defense that BP never raised. We do not agree. In the pretrial order, BP identified as a factual issue "[w]hat contamination is attributable to Defendants." There was oft-repeated evidence during the trial, even from the Plaintiffs' experts, that there were plumes of contaminants from other sources, including businesses in the industrial park and underground storage tanks at various fueling locations (including the City's fire station), that had to be accounted for.

We do not see this to be reversible error.

*Overall impact of Instruction No. 4*

From our review of the record, we find that the only instruction objection made and ultimately overruled by the trial court was the Plaintiffs' request that the reference in

27

Instruction No. 4 to the K.S.A. 65-6203 claim should read: "Defendants' failure to clean up violated 65-6203. . . ." The court originally agreed to this but failed to include the revision in the instruction read to the jury. The next morning, the court found that the unedited version of that part of Instruction No. 4—"Defendants' clean up violated K.S.A. 65-6203 by causing the release and discharge of the refinery contamination . . . ."—was correct. This requested language was legally appropriate in explaining the Plaintiffs' claim against BP, and there was sufficient evidence to present the K.S.A. 65-6203 claim before the jury. So we see no error in this point.

We are mindful that instructions in any particular action are to be considered together, read as a whole, and where they fairly instruct the jury on the law governing the case, error in an isolated instruction may be disregarded as harmless. If the instructions are substantially correct and the jury could not reasonably have been misled by them, the instructions will be approved on appeal. *Wood v. Groh*, 269 Kan. 420, 423-24, 7 P.3d 1163 (2000).

Even though subparagraph (5) of Instruction No. 4 lacks the requested language of "failure to clean up," the introductory paragraph to the Plaintiffs' claims section specifically states that the Plaintiffs claimed damages "stemming from Defendants' failure to clean up the refinery contamination in Neodesha." Similarly, Instruction No. 13 correctly states the law under K.S.A. 65-6203 that there was an accidental release of materials detrimental to soil or water, that BP was responsible, and that the Plaintiffs owned property where the release or discharge occurred. In addition, the court specifically added the italicized language in Instruction No. 23, the damage instruction, which stated: "You may only consider awarding damages that arise from Defendants' remediation *or alleged failure to remediate*. You may not award the Plaintiff Class damages from any activity of Defendants related to the operation of the Refinery." (Emphasis added.)

28

*We see no clear error.*

The Plaintiffs did not object to many of these instructions. The trial court is required to properly instruct the jury on a party's theory of the case. Errors regarding jury instructions will not require reversal unless they result in prejudice to the appealing party. Instructions in any particular case are to be considered together and read as a whole, and where they fairly instruct the jury on the law governing the case, error in an isolated instruction may be disregarded as harmless. If the instructions are substantially correct and the jury could not reasonably have been misled by them, the instructions will be approved on appeal. *Manhattan Ice & Cold Storage v. City of Manhattan*, 294 Kan. 60, 81, 274 P.3d 609 (2012).

With all of that in mind, and based upon the instructions read as a whole, it appears that even though the instructions were complex and lengthy, they advised the jury of the nature of the Plaintiffs' claims and adequately and correctly explained the applicable legal principles for the jury to apply to the evidence. Even though these were difficult instructions to read and understand, the Plaintiffs have not persuaded us that there was clear error in reading these instructions as a whole that would cause us to reverse and order a new trial. We cannot conclude that these instructions misled this jury. Nor are we firmly convinced that the jury would have returned a different verdict had the instructions not been given. See *Smyser*, 297 Kan. at 204.

We will now review a series of pretrial and trial discretionary rulings that the Plaintiffs contend are erroneous.

RULING THAT A LAWYER'S MEMORANDUM WAS PRIVILEGED

During discovery, a document was inadvertently produced that the parties now refer to as "The Book of Common Prayer" for some reason that escapes us. This

document does not appear in the record on appeal. But, based on the recorded attorneys' discussions, it is clear that the document was a memo issued on May 5, 2003, and written by Evan Westerfield. Westerfield was an outside counsel for BP. The document was sent to several BP and to RETEC Group employees involved in the Neodesha project. RETEC Group, Inc. (RETEC) was BP's remediation contractor on this project. Evidently, this document was created after it appeared that the City was considering litigation. It included a 12-page summary of prior positions and statements made by BP regarding issues affecting its environmental remediation efforts in Neodesha. The summaries were accompanied by requests from Westerfield for additional information from the employees.

In Westerfield's affidavit, he averred the document was drafted in order to have a consolidated document for purposes of "issues to be addressed by the community relations team" and "legal advice and [] impressions concerning which of these issues would be the focus of the pending litigation." This was done so that additional investigation could be undertaken.

The trial court entered a detailed order concerning this document. It found the exhibit was protected by both the attorney-client and work-product privilege. The Plaintiffs were ordered to deliver all copies of the document in their possession to the court to be placed under seal. BP was ordered to produce to the Plaintiffs copies of the document with redactions of the attorney's comments, his mental impressions, and his work product. The court then ruled that the Plaintiffs could question witnesses about factual information in the document, but they could not inquire about the content of any conversations with counsel concerning the document.

The Plaintiffs' failure to attach a copy of the document that was proffered and made part of the record denies this court an opportunity to review a challenge to its exclusion from use at the trial. See K.S.A. 60-405; *Manhattan Ice*, 294 Kan. at 74. As the

30

blind men in the parable could not adequately describe an elephant, we cannot judge whether the trial court erred in ordering the document returned to BP. Nor can we decide if the redacted copy was inadequate for discovery. It is the Plaintiffs' burden, as appellant, to designate the record to establish any claim of error, and without such record, this court will not presume error. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644-45, 294 P.3d 287 (2013).

But this issue does not end with one document. The Plaintiffs filed a motion seeking disclosure of all documents which BP claimed were attorney-client communications. They alleged that the crime-fraud exception of K.S.A. 60-426(b)(1) applied. Obviously, application of that rule would abrogate the privilege against disclosure.

This motion was accompanied by three notebooks of exhibits that included numerous press releases and nonprivileged documents, as well as BP's privilege log dated March 2005 and supplemental privilege log dated December 2006. The log lists over 1,100 documents from 1933 to 2003 for which BP was claiming attorney-client and/or work-product privilege. The Plaintiffs have not identified a single document that they believed substantiated their allegation that the crime-fraud exception applied.

In response to all of this, the trial court gave a detailed ruling in May 2007, finding that the Plaintiffs had failed to identify any specific misrepresentation to support their claim that the crime-fraud exception applied.

The Plaintiffs renewed this motion after discovery closed. Once again, after reviewing all of the evidence, the trial court concluded that although the Plaintiffs made a prima facie case of fraud, they failed to establish a connection between the allegedly fraudulent acts and the attorney-client communications. The court denied that motion. In

turn, the Plaintiffs' posttrial motion for a new trial on the same grounds was also denied for the same reasons.

It appears that the Plaintiffs' theory was that BP was deliberately or recklessly misrepresenting the nature and extent of the contamination from the refinery through a long-term public relations campaign in which counsel participated in order to avoid or delay a lawsuit and to avoid cleaning up the contamination.

Even though the Plaintiffs in their brief have failed to summarize the types of documents included in BP's privilege log, we have done so:

- Documents regarding the shutdown of the refinery, cleanup issues immediately upon closure, and the potential transfer or possible leases relating to the refinery property, all dated shortly before or after 1970.
- Documents between other attorneys and Amoco/BP during the 1980s and 1990s about remediation.
- Documents from in-house counsel, Janice McLain, to agents regarding semiannual groundwater monitoring and other remedial measures beginning in 1999, deed restrictions, other activities, and presuit settlement negotiations.
- Documents involving attorney Westerfield, including memos dating from April 2000 to September 2003 discussing the quitclaim deed to the City; access agreements and water wells; Agency for Toxic Substances and Disease Registry reports and meetings; responses to letters to the editor; deed restrictions for refinery property; easement agreements; zoning issues; establishing and operating a property protection program; indoor testing consent agreement; creation of an advisory board; a summary of Kansas regulations and proposals for amendments to regulations; remediation activities; contamination issues at New Beginnings; groundwater well

32

surveys, city sewer issues; proposed water well ordinance; potential Neodesha litigation; research of the lawfirm regarding pursuing potential litigation; prelitigation negotiations with the City; post-lawsuit issues; and invoices for services rendered.

- Additional Westerfield documents relating to legal advice regarding a public meeting flyer, public meeting powerpoint documents, discussions of NEAT meeting, community update letter, Q & A documents, draft press releases, community relations schedule, advisory board retreat, and public affairs plans.

- Documents to other outside counsel during settlement negotiations and actual litigation.

We also note that the Plaintiffs did not ask the trial court to conduct an in-camera inspection of BP's documents. The Plaintiffs failed to identify for the trial court—or this court—any specific document or group of documents to support their claims. A trial court may conduct an in-camera inspection of alleged confidential communications to determine whether the attorney-client privilege applies. *Freebird, Inc. v. Cimarex Energy Co.*, 46 Kan. App. 2d 631, 638, 264 P.3d 500 (2011). Importantly, the Plaintiffs have not shown that the trial judge's decision that they failed to establish a connection between the multitude of privileged documents and the alleged misrepresentations made by BP was improper. Based on all of this, we do not find that the trial court's ruling upon this issue was an abuse of discretion. This was not a good reason to order a new trial in this case.

WE REVIEW THE CLAIMS OF TRIAL ERRORS.

The Plaintiffs claim 16 trial errors. They argue that each error is sufficient reason to grant a new trial. But, taken all together, the Plaintiffs allege these errors show that they did not receive a fair trial. Because of the large number of claimed errors, we have grouped the issues into four general categories. We begin with pretrial matters and then

33

move to the trial court's assorted evidentiary rulings. Following that, we examine the Plaintiffs' complaints about how the court conducted the trial. At the end, we review the claim of error concerning the verdict.

*Kansas Department of Health and Environment and federal agency reports*

In this issue, the Plaintiffs contend the trial court improperly admitted evidence from the Kansas Department of Health and Environment and the Agency for Toxic Substances and Disease Registry, an agency within the United States Department of Health and Human Services. We refer to this group as the Agency. The Plaintiffs now contend that the reports from these bodies were opinion evidence, lacking in foundation, and were improperly admitted. The Plaintiffs claimed they could not cross-examine any of the opinions contained within those reports. The Plaintiffs also claim all of this information was impermissible hearsay. The Plaintiffs never objected to use of this evidence at trial.

We note that prior to trial the Plaintiffs filed motions in limine seeking to exclude the reports from both the Department of Health and the Agency. The trial court denied the motion in limine and stated it would rule on objections to hearsay at the trial.

In their brief, the Plaintiffs cite different points during the trial where they claim that these agency reports were improperly admitted. Our review of the record reveals there were no objections at any point during the cited testimony or closing arguments. When the trial court denies a motion in limine and the subject evidence is introduced later at trial, the moving party must object at trial to the admission of the evidence in order to preserve the issue for appeal. *Unruh v. Purina Mills*, 289 Kan. 1185, 1193, 221 P.3d 1130 (2009).

34

Interestingly, the Plaintiffs presented to the jury the video deposition of a Department of Health employee, Kurt Limesand. In addition, Limesand and another Health Department geologist, Pamela Chaffee, testified personally in court. Both of the geologists were involved in the regulatory approval of the Neodesha remediation efforts.

The record reveals that a group of citizens in the Neodesha community had asked the Agency to evaluate the contamination. Then they asked TOSC, the group from Kansas State University dealing with hazardous substance issues, to act as an intermediary between the City and the Agency. The Agency released health consultation documents for public comment in 2003. City officials reviewed all of these documents. Agency representatives came to Neodesha several times and released health consultation reports discussing potential lead contamination at a daycare facility in 2006.

The Plaintiffs' toxicology expert, Dr. James Dahlgren, testified that he considered the Agency documents and the Department of Health documents while forming his opinion regarding the contamination risks even though he disagreed with the reports' conclusions. Dr. Dahlgren admitted he relied on the Agency's toxicological profile regarding arsenic and air testing results while forming his opinion. He found that report useful to the extent it summarized relevant literature and contained reference sources, although he again questioned the reliability of some of the final reports in light of the report of the Plaintiffs' other expert, Dr. Daniel Stephens.

Dr. Stephens, a hydrologist, relied upon and discussed the standards and reports made by the Department of Health. Dr. Stephens also referred to the Corrective Action Study approved by the Department. The Plaintiffs elicited some of this testimony and then did not object when BP referred to it. The Plaintiffs did object when BP tried to discuss the Department report involving a contamination plume from Airosol, a local company. The trial court admitted that evidence to impeach Dr. Stephens' testimony

35

about which contaminants were attributable to BP and which to Airosol. Dr. Stephens also agreed that the Agency reports provided information on health toxicology.

In their brief, the Plaintiffs focus only on the 2007 Agency report on updated soil testing results. This was a follow-up report on Agency data that was previously presented to the City. The report was sent to City officials but the City administrator and City commissioner did not recall reviewing the report because it was delivered when the City was in the middle of a flood. Later, the City commissioner testified he did not review the document because it relied on BP for all of its data and he and the City administrator did not trust it. Finally, the Plaintiffs objected to the Agency document for lack of foundation and hearsay. We note that the Plaintiffs offered an exhibit during its redirect examination of Dr. Dahlgren that was a copy of the 2007 Agency report, and it was admitted into evidence.

From our view, we cannot see that these admissions were erroneous. In light of all of the experts' consideration of these many documents in the formulation of their opinions and the extensive dealings the City had with TOSC and the Agency for independent testing, the reports do not appear to be improperly admitted.

In conclusion, we must point out that K.S.A. 60-404 generally precludes an appellate court from reviewing an evidentiary challenge "'unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection.'" *State v. Holman*, 295 Kan. 116, 126, 284 P.3d 251 (2012). Simply put, the Plaintiffs did not object to this evidence, and therefore we will not review the matter any further.

36

*Admission of the "wish lists"*

The Plaintiffs claim that the trial court erred when it admitted documents covering prelawsuit settlement negotiations between the Plaintiffs and BP. The City and BP engaged in settlement negotiations beginning in July 2003. The Plaintiffs now complain that the court improperly compelled them to produce internal documents relating to those settlement negotiations which were then improperly used by BP at trial. Knowledge of the circumstances is important to understand this claim.

The facts surrounding these settlement negotiations are muddy at best. The record does reflect that in September 2002, BP asked permission to discharge fluids through the City's sewer system. The City agreed if BP would pay $620,000 to help upgrade the system. When BP declined, it raised a "red flag" for City Commissioner J.D. Cox. After that, some City officials visited Sugar Creek, Missouri, in November 2002 and became aware of the large amount of money BP had invested in that community in addition to that spent on remediating the contamination. Then, in November and December 2002, emails were exchanged between various City officials discussing "wish lists" to present to BP asking for similar community reinvestment projects for Neodesha. At this point, the City had retained an attorney, Jeff Kennedy, to obtain some additional education regarding the issues concerning other environmental cleanup sites for which BP was responsible. There is an affidavit of City Commissioner Casey Lair in the record that stated the City was considering litigation beginning in June 2003.

While this was going on, an advisory board composed of a variety of citizens and representatives of the City, the county, the Department of Health, and BP came together to study the situation. BP and the Department of Health suggested the formation of this advisory board to provide a community review of BP's proposed remediation plan. This plan was called the Corrective Action Study. This group started its review in April 2003 and concluded sometime in August or September 2003. The advisory board unanimously

37

approved the Corrective Action Study. Ultimately, the Department of Health approved the study.

Meanwhile, some City officials approached BP about City projects at some point in mid-2003. In July 2003, in response to the City's requests, BP's representative suggested another group be formed that included various representatives of different constituencies to study these subjects. After discussions between the working group and BP stalled, the Plaintiffs filed this lawsuit.

The Plaintiffs asked for a protective order barring the discovery of these documents in May 2007. The Plaintiffs contended that BP was improperly questioning various witnesses in its depositions about settlement negotiations. The Plaintiffs claimed three privileges: attorney-client, work-product, and deliberative privileges. At this point, they also claimed the information was inadmissible under K.S.A. 60-453 as it was related to settlement negotiations.

The trial court granted the Plaintiffs' motion for a protective order with respect to discussions and thought processes of the members of the BP work group based on K.S.A. 60-452 and K.S.A. 60-453. However, the trial court also ordered the Plaintiffs to produce their documents identified by BP for an in-camera inspection to evaluate the applicability of any of the privileges. After examining the documents, the trial court ordered some produced for discovery.

On appeal, the Plaintiffs specifically complain about the admission of Exhibits 1024, 1038, 1041, 1048, 1053, and 1056. None of these exhibits are included in the various volumes of trial exhibits included in the record on appeal. Similarly, the Plaintiffs fail to cite to the record where such documents can be found. From the testimony, however, we deduce:

- Exhibit 1048 was a June 4, 2003, e-mail from Cox to City Administrator Joe Kerby, City Commissioner Casey Lair, and City Commissioner Jim Schuessler about a position paper asking BP to pay for developing a comprehensive plan for the City and the industrial park, as well as the creation of Neodesha Lake as an alternative water source.

- Exhibit 1053 was a December 2003 e-mail from Lair to industrial representative Ted Peitz that included an earlier e-mail from Peitz about his "wish list."

- Exhibit 1041 was a document that listed Peitz', Lair's, and Kerby's "wish lists"; the date of the document is not specified.

- Exhibit 1024 was a copy of the various "wish lists" placed side by side.

- Exhibit 1056 was a timeline put together by Cox, but the date is unknown.

The Plaintiffs limit their objections to these exhibits to a claim these are documents regarding settlement negotiations and are not discoverable under the work-product doctrine.

We note that the work-product doctrine, K.S.A. 2012 Supp. 60-226, is a discovery rule. Under K.S.A. 2012 Supp. 60-226(b)(4), documents prepared in anticipation of litigation or for trial by or for a party are not discoverable by another party in the absence of some specific showing of need. The work-product rule is not an absolute privilege but rather a limitation on discovery. *Wichita Eagle & Beacon Publishing Co. v. Simmons*, 274 Kan. 194, 218, 50 P.3d 66 (2002). Certainly by implication the rule precludes any idea of extending the work-product doctrine to reports or statements, even if written, obtained by the client or his or her investigators which are not prepared under the supervision of an attorney in preparation for trial. 274 Kan. at 220.

We must point out that we cannot tell from the record whether the documents ordered produced by the trial court were the same documents now at issue. The Plaintiffs

have failed to adequately designate a record for us to review this issue. The record does reveal that the trial judge ordered the production of documents for in-camera inspection in the same order granting the Plaintiffs' motion for a protective order precluding questioning about settlement negotiations.

We also note that the Plaintiffs object because the documents and testimony were inadmissible under K.S.A. 60-453. That statute provides that evidence a person has offered to accept a sum of money or any other thing, act, or service in satisfaction of a claim is inadmissible to prove the invalidity of the claim or any part of it. Obviously the purpose of the statute is to promote settlement without fear the settlement will be used in evidence against the settling parties. See *Lytle v. Stearns*, 250 Kan. 783, 791, 830 P.2d 1197 (1992).

BP argues this evidence was admissible to impeach the Plaintiffs' witnesses regarding their motives in filing the lawsuit and to directly contradict their testimony about the nonexistence of "wish lists." In addition, it appears that a document containing similar information was admitted and not challenged by the Plaintiffs on appeal. This includes the Plaintiffs' Exhibit 1045 given to BP's representatives by Cox and Lair even though the advisory group was still meeting and reviewing BP's remediation plan. In addition, Cox testified about "wish lists" being drafted as early as November and December 2002, six months before City officials admitted they were contemplating litigation and actually attempted to initiate settlement negotiations.

Additionally, the Plaintiffs did not object to the testimony of several witnesses about what was on the lists and how they were compiled. The admission of the lists themselves might have been cumulative but not so prejudicial as to require reversal.

By using these documents, BP opened the door for the Plaintiffs to present extensive testimony about BP's contamination issues in litigation concerning plants in

40

Sugar Creek, Missouri, and Casper, Wyoming. The trial court had, in a pretrial ruling, prohibited such evidence. But because of BP's use of these documents, the Plaintiffs were able to present evidence about the lawsuits in Wyoming and Missouri through its examination of various witnesses. The Plaintiffs used this information to their considerable advantage. Given this record, we conclude that if there was error in the admission of these exhibits, we are not convinced the jury's verdict would have changed had they not been admitted. See *Kansas City Mall Assocs. v. Unified Gov't of Wyandotte County/KCK*, 294 Kan. 1, 8, 272 P.3d 600 (2012).

Thus, we see no abuse of discretion in the trial court denying the motion for a new trial on these grounds.

*Opinion testimony offered by three witnesses*

Next, the Plaintiffs claim the trial court erred in permitting three BP witnesses to offer opinion testimony during the trial: Tammy Brendel, Stan Flagel, and DeWayne Prosser. These three were not designated as expert witnesses. The Plaintiffs point out that permitting their testimony was prejudicial to Plaintiffs' case because these three witnesses were the only ones that criticized the testimony of the Plaintiffs' expert, Dr. Stephens. We will review their testimony in order.

A brief review of the law is helpful at this point. K.S.A. 60-456(a) states that if the witness is not testifying as an expert, his or her testimony in the form of opinions or inferences is limited to such opinions or inferences the judge finds (a) may be rationally based on the perception of the witness and (b) are helpful to a clear understanding of his or her testimony. This statute permits opinion testimony by a nonexpert witness if the opinion is incidental to the witness' actual knowledge of the facts and circumstances of the case. See *Pullen v. West*, 278 Kan. 183, 211, 92 P.3d 584 (2004). Of course, whether a witness, expert or layperson, is qualified to testify as to his or her opinion is to be

41

determined by the trial court in the exercise of its discretion. That discretion is not subject to review except for abuse of that discretion. *Blue Cross & Blue Shield of Kansas, Inc. v. Praeger*, 276 Kan. 232, 271, 75 P.3d 226 (2003).

Brendel was the site manager at Neodesha for BP's remediation management group and was responsible for overseeing contamination cleanup and community relations related to the cleanup. After she joined BP, Brendel was trained to oversee environmental consultants such as geologists or hydrogeologists, to work with state agencies, and to deal with various third parties. She testified that BP would have periodic meetings to exchange information, present technical experts, and otherwise learn from consultants.

Brendel was accused of making false statements to the Plaintiffs. In response, BP's counsel asked her whether she knew, prior to the lawsuit being filed, where the contamination plume was and whether she currently knew where the contamination was located. Based upon her personal knowledge of the files, she testified she was comfortable in saying where the contamination plume was and that it was stable. She was then asked if she was comfortable in saying there was no risk. At this point, the Plaintiffs objected because she was not an expert qualified to testify about risk. The trial court overruled the objection, and Brendel testified that based upon her review of the files, including the risk assessment, she was comfortable in saying there was and currently is no risk. As her final point, Brendel testified that BP was cleaning up the contamination. A fair reading of the testimony reveals that Brendel's statements were based on her personal knowledge from working as the BP site manager and by being familiar with BP's records regarding the site. This testimony appears to be relevant to responding to the Plaintiffs' allegations that she, along with other BP employees, made prior misrepresentations on these subjects. The weight given to her testimony, of course, was for the jury to decide.

Brendel also testified from her experience that all refineries did not look for off-site contamination plumes before 1990 because that was when governmental regulations changed. The Plaintiffs objected based upon hearsay and lack of foundation. This objection was overruled. The Plaintiffs also objected when Brendel was asked what her understanding was about the effect of clay under the contamination site and to her statement that the presence of the clay was another reason why she believed there was no risk. Finally, Brendel was permitted to testify that as site manager and based upon her own experience it would not be appropriate to guess how long it would take to remove the contamination.

Next, the Plaintiffs complain about the testimony of Flagel, a hydrogeologist who worked for BP's contractor RETEC. Flagel worked at the Neodesha site from 2001 through 2007. The Plaintiffs objected when the trial court allowed Flagel to testify that the water from the groundwater testing wells set by BP was not potable under current Kansas health regulations. These were wells he had tested. The Plaintiffs also objected when Flagel was permitted to testify that based on comparing groundwater monitoring reports from 2000 and 2006 with his observations at the site, benzene concentrations at the test wells had decreased. These opinions were based on Flagel's own knowledge and his perception of the testing that he helped monitor.

Moving on, the Plaintiffs also complain about certain portions of the testimony of Prosser, a local pastor and former City commissioner and county commissioner. We note that Prosser and his church opted out of the class action. The Plaintiffs challenge Prosser's testimony about his personal observations of several of the churches claiming damages that were constructing new buildings on the BP plume site after the lawsuit was filed. Prosser's cited testimony related to his personal observation about the rebuilding and clearly was not opinion testimony. The trial court sustained objections to BP's attempt to get Prosser to testify about the extent of damage caused by a flood in 2007.

Based on our review of the record and the nature of the testimony presented, the Plaintiffs have failed to establish that the trial court erred in admitting this testimony. In each instance, the opinions appear to be based upon the witness' actual knowledge of the facts and circumstances of the case. See *Pullen*, 278 Kan. at 211. We find no abuse of discretion here and certainly insufficient grounds to grant a new trial.

*Testimony of Louis L. Wilde*

The Plaintiffs contend that the trial court erred when it permitted BP to present the testimony of Dr. Louis Wilde concerning any drop in the value of real estate in Neodesha due to the contamination caused by the oil refinery. We note that the Plaintiffs do not claim that Dr. Wilde's testimony affected the jury's determination that BP was not liable under any of their theories.

The qualification of an expert witness and the admission of that witness' testimony are matters within the broad discretion of the trial court. *Manhattan Ice & Cold Storage v. City of Manhattan*, 294 Kan. 60, 70, 274 P.3d 609 (2012). In order to testify as an expert, the witness must testify within the scope of the individual's "special knowledge, skill, experience or training." K.S.A. 60-456(b).

The record reveals that Dr. Wilde graduated from the University of Iowa with a B.A. in mathematics in 1968 and from the University of Rochester with a graduate degree in economics in 1977. He received his doctorate and became an assistant professor at the California Institute of Technology. At that school, he taught various economics classes in the undergraduate program and also taught microeconomic and public finance courses to graduate students. One of the classes he taught was environmental economics, which focused on figuring out how to deal with environmental problems that might arise that the market cannot address. This includes developing taxes, penalties, subsidies, and other solutions for environmental issues.

44

By 1992, Dr. Wilde had moved into consulting work. In this case, he was hired to analyze the real estate market in Neodesha and determine whether property values had dropped due to the discovery of the off-site contamination from the oil refinery. The Plaintiffs objected to Dr. Wilde's qualifications because he was not an appraiser and his studies had not been in real estate. The trial court concluded Dr. Wilde could testify as an economist and allowed him to display certain slides to the jury as visual aids to his testimony. The court excluded other slides because they invaded the province of the jury.

Basically, Dr. Wilde compared the real estate markets in Fredonia and Neodesha by statistically comparing the appreciation rates between the housing markets in the two communities. He discussed the appreciation rates between the two markets and noted them moving together between 1997 and 1999. He testified that Fredonia's appreciation rate swept up between 2000 to 2002 and Neodesha's rate lagged for a couple of years but by 2002 the two communities' appreciation rates were the same and continue to remain the same except for a brief bump-up in Neodesha's values in 2006.

Put quite simply, the Plaintiffs have failed to persuade us that Dr. Wilde was unqualified to express the opinions he presented. Dr. Wilde established his training and experience in the economic analysis of real estate affected by environmental issues. The Plaintiffs do not cite any portion of Dr. Wilde's testimony where he exceeded this background and training. Nor do the Plaintiffs cite any authority that supports their assertion that the only way to measure property value damages in this case is through the real estate appraisal process. The Plaintiffs' citation of K.S.A. 79-503a is not helpful because that statute deals with controlling the value of property for ad valorem tax purposes and does not pertain to the issues here.

Additionally, since the jury found BP not liable on any theory, we doubt if the jury ever got to the issue of damages and even considered this evidence.

45

Based on this record, we hold the Plaintiffs have failed to establish the trial court abused its discretion by allowing Dr. Wilde to testify.

*Speculation about lost tax revenues*

In this issue, the Plaintiffs challenge the trial court's ruling that evidence concerning possible lost tax revenues was inadmissible. Prior to trial, BP, in a motion in limine, sought to exclude evidence relating to any governmental entity's claim of lost tax revenue. BP argued that lost tax revenues are not a recoverable claim for damages because the claims are solely derivative of the losses suffered by third parties. The trial court agreed and ruled that the Plaintiffs' claim of $61 million in lost tax revenue is a derivative claim and would not be recoverable. In other words, the calculation of such a claim would depend upon too many variables beyond the subject of the lawsuit and any award for such would be the result of mere speculation.

To us, the Plaintiffs provide no citation to any legal authority that supports their position that lost tax revenue is a direct and foreseeable result of BP's failure to live up to its commitment to the "long term economic development of Neodesha." Failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue. *State v. Tague*, 296 Kan. 993, 1001, 298 P.3d 273 (2013).

The case cited by the Plaintiffs to the trial court, *Hawkinson v. Bennett*, 265 Kan. 564, 962 P.2d 445 (1998), is not helpful. In that case, the Supreme Court ruled that a business' claims for lost past and future profits were not too speculative to be allowed. The claims were based on testimony of someone who had personal knowledge of the financial and sales history of his franchise. The jury was free to give whatever weight, if any, to the testimony. 265 Kan. at 592.

In contrast, we hold the trial court correctly assessed this evidence as being speculative in this case because the value of lost tax revenues would depend entirely upon the value of any third party's property, the disposable income of the residents, the national and local economy, and the tax laws in effect at the time of assessment. All of these are subjects not covered by the evidence presented in this lawsuit.

Other courts have rejected such claims. See, *e.g.*, *Wyoming v. United States Dept. of Interior*, 674 F.3d 1220, 1234-35 (10th Cir. 2012). In that case, the court ruled that a lost future tax revenue claim was too speculative and did not give the petitioners standing to challenge the regulation limiting snowmobile use in national parks.

Finding no authority to support the Plaintiffs' position, we hold that this is not grounds for a new trial.

*Evidence of flood and subsequent FEMA efforts*

Floodwaters inundated Neodesha in 2007. As a consequence, the Federal Emergency Management Agency, FEMA, provided help for the community. The Plaintiffs now argue that any evidence concerning either the flood or the remediation efforts by FEMA was irrelevant and designed to confuse the issues. In their view, such evidence was inadmissible.

The Plaintiffs complain in their brief that BP improperly cross-examined witnesses on this topic, but they fail to cite to any support for those assertions in the record. Under our appellate rules, facts must be keyed to the record by volume and page so as to make verification reasonably convenient. Any material statement made without such a reference may be presumed to be without support in the record. See Rule 6.02(a)(4) (2013 Kan. Ct. R. Annot. 39); *Kansas Medical Mut. Ins. Co. v. Svaty*, 291 Kan. 597, 623-24, 244 P.3d 642 (2010).

The Plaintiffs confine their complaint about this to a small portion of the testimony of Prosser, a former City commissioner, a county commissioner, and a pastor of a local church. Indeed, Prosser testified about the flood in June 2007 and the actions taken by various churches that collected clothing, furniture, and other items for flood victims. After the flood, Prosser saw that the local Nazarene church no longer used its old parsonage but started building a new parsonage within BP's designated plume area. Prosser also testified that within the last 2 years after the lawsuit was filed, he noted the local Catholic church had built a fellowship hall within the BP plume area.

Our reading of the record discloses no reference in Prosser's testimony about FEMA.

We note that the Plaintiffs' own witnesses also stated that a flood occurred in Neodesha after the filing of this lawsuit. The Plaintiffs' witnesses also proffered exhibits about the cost to construct new churches and public buildings as part of the Plaintiffs' damage claim. Thus, the testimony that two of the churches chose to construct a new building on the surface above the acknowledged BP contamination plume after suit was filed would be relevant to those claims for damages as well as the Plaintiffs' claim regarding the perceived health risks of buying or building property in Neodesha. In our view, Prosser's testimony on this point is a small part of a 17-week jury trial.

This limited reference to a natural disaster was not prejudicial to the Plaintiffs' claims. We are not persuaded that the admission of this evidence is grounds for ordering a new trial.

*Attacks trying to discredit Dr. Dahlgren*

During trial the Plaintiffs presented the testimony of a toxicologist, Dr. Dahlgren. The Plaintiffs contend that BP improperly presented evidence in an attempt to discredit Dr. Dahlgren.

Dr. Dahlgren is a licensed California physician who has practiced internal medicine and toxicology since 1972. Dr. Dahlgren testified at length about the risks of exposure to benzene and other refinery-related pollution at the Neodesha site, even though no one made a personal injury claim in this case. BP's counsel cross-examined him extensively.

One of the topics of cross-examination focused on Dr. Dahlgren's website for his B-Well Clinic. During cross-examination, Dr. Dahlgren confirmed that the clinic provides services such as naturopathic and traditional Chinese medicine and gave people advice about improving their health through diet, exercise, and lifestyle. The clinic also offers detoxification services that include sauna-based detoxification, niacin treatments, and high doses of antioxidants, as well as cold-pressed oils to remove lipid-based toxins. The website advertises Chinese medical treatment such as cupping and Jin Shin. Dr. Dahlgren admitted that he did not understand these therapies and traditional Chinese medicine was not scientifically proven but did achieve results with some patients.

Our reading of the record indicates that the only objection the Plaintiffs made during Dr. Dahlgren's cross-examination was to an exhibit concerning an advertisement for his services for evaluating populations exposed to environmental pollutants. The Plaintiffs' objection was that the exhibit was not on BP's exhibit list. The trial court overruled the objection because it was presented for impeachment purposes. The Plaintiffs did not assert any other objection during the cross-examination about Dr. Dahlgren's clinic and his one-time association with a Chinese doctor at the clinic.

Based upon this, we think the Plaintiffs' failure to contemporaneously object to this portion of Dr. Dahlgren's cross-examination precludes our appellate review on this point. Kansas appellate courts have repeatedly relied upon K.S.A. 60-404, which requires a timely and specific objection to challenged evidence. *State v. Holman*, 295 Kan. 116, 126, 284 P.3d 251 (2012).

K.S.A. 60-404 similarly applies to the trial court's consideration of a new trial motion. We think this rule also applies to the situation when a trial court considers a motion for a new trial. See *State v. Cook*, 286 Kan. 1098, 1109, 191 P.3d 294 (2008). For want of an objection, we will not review the matter.

*Evidence of BP's safety record and honesty*

The Plaintiffs aver that the trial court erred in excluding certain evidence about BP's poor safety record in response to BP employees who testified that BP's primary focus was on safety. The Plaintiffs contend the trial court's ruling minimized the effect of negative evidence which they wanted to present to the jury. The Plaintiffs have not properly framed this issue for our court.

The Plaintiffs' brief fails to detail any of the documents or argue why the trial court's handling of them was contrary to any statute or was an abuse of discretion. The brief refers to a number of documents that the Plaintiffs downloaded from the BP website that they wanted to use for impeachment purposes. The record reveals that the trial court excluded some of the documents as irrelevant, some as unduly prejudicial, and some as improper under K.S.A. 2012 Supp. 60-455. But, we note the trial court did allow the Plaintiffs to cross-examine at least one BP employee regarding some of the statements made in the documents by BP executives. Simply put, the Plaintiffs have failed to specifically identify any of the documents or adequately explain their impeachment value or argue any basis to establish the trial court's specific rulings that were erroneous or an

50

abuse of discretion. A point raised incidentally in a brief and not argued therein is deemed abandoned. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 645, 294 P.3d 287 (2013).

We question if this amounts to reversible error. The trial court did permit the Plaintiffs to use downloaded documents to cross-examine BP's witnesses. One witness was cross-examined about a website document discussing the discovery of oil in deep-water drilling off the coast of Angola, comparing the depth of their drilling for oil to the depth of the field in Neodesha. The witness agreed safety was always an issue and could always be improved. The witness was asked about BP's chairman of its board of directors 2007 comments to the board that BP continued to "face a series of regulatory issues in the U.S.—a perfect storm, if you like, but mostly of our own making." In addition, the Plaintiffs were permitted to inquire about and admit documents reflecting other comments of the chairman of the board about the company setting high standards "in the way in which we interact with [the] communities in which we operate . . . [but] have failed to live up to those standards."

In our view, the trial court used an even-handed approach in dealing with this issue. We note that by relying on the "wish list" documents, the trial court allowed the questioning of BP witnesses about lawsuits arising from a series of contamination sites in Casper, Wyoming, and Sugar Creek, Missouri. These other contamination sites were discussed repeatedly with BP employees and others. Similarly, the trial court permitted another Neodesha witness, Ted Peitz, to testify that his father died of lymphoma and his concerns that he and two of his employees might have a genetic disposition to lymphoma. Consequently, Peitz' company pays for screenings for those men at a special clinic.

We do not see this as reversible error.

*Denying the deposition of Lord Browne*

In a closely related issue, the Plaintiffs complain that the trial court unreasonably refused their request to depose Lord John Browne, the chief executive officer of BP p.l.c., BP's parent corporation.

BP objected to the motion to compel Lord Browne's testimony. BP argued that Lord Browne was a subject who resided in the United Kingdom and that BP p.l.c. was not a party to this action. BP made similar arguments with respect to a request to depose Tony Hayward, who replaced Lord Browne as CEO in 2007. No subpoenas in this case were issued according to the Hague Service Convention, as required for international legal process.

The Plaintiffs say they wanted to depose Lord Browne because he created the BP Code of Conduct, which was cited frequently by BP during its community relations campaign. The Plaintiffs pointed out he ended up resigning as CEO after he was caught lying to the parent corporation's board of directors. According to the transcript, Lord Browne was terminated after the London newspapers reported that he had a homosexual affair. Browne was reportedly terminated by the board for lying about the relationship.

We see nothing in the record that persuades us that the trial court's ruling was incorrect on this point. The Plaintiffs have made no showing of any alter ego that would allow them to pursue the parent corporation. The trial court's refusal to grant a new trial on this basis is not an abuse of discretion.

*Limiting closing arguments to 4 hours*

The Plaintiffs contend that the trial court abused its discretion in limiting closing arguments to 4 hours per side. The record reflects the judge announced the 4-hour limit

after conferring with the parties on the final version of the jury instructions. At no time did the Plaintiffs assert to the judge that the 4-hour limit was insufficient to present their case. The Plaintiffs never requested additional time for a rebuttal because of any arguments made by BP's counsel.

We view this as a matter of discretion by the trial court. The proper length of closing argument is an issue left to the sound discretion of the trial court. *State v. Trotter*, 245 Kan. 657, 662, 783 P.2d 1271 (1989). Here, 4 hours does not appear unreasonable, especially in light of the fact neither party objected to the time allotted. We see no reversible error here.

*Insufficient sanctions imposed on BP*

The Plaintiffs argue that the trial court abused its discretion by not imposing a more severe sanction upon BP because it produced a huge number of documents just before the trial started. In the Plaintiffs' view, BP produced thousands of pages of documents on the "eve of trial." They now argue that the trial court should have struck BP's pleadings and entered default judgment in their favor.

The decision to impose sanctions for discovery abuses rests within the sound discretion of the trial court. We, as an appellate court, review such sanctions to see if there is an abuse of discretion. See *Schuerholz v. Hinzman* 295 Kan. 786, Syl. ¶ 11, 289 P.3d 1155 (2012). As we have stated before, a judicial act constitutes an abuse of discretion if the action is arbitrary, fanciful, or unreasonable—*i.e.*, if no reasonable person would take the view adopted by the trial court—or is based on an error of law or an error of fact. See *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

The record on appeal reflects that 6 weeks before the trial started the Plaintiffs sought sanctions against BP for failing to timely produce documents. Sometime in March 2007, the Plaintiffs requested certain documents from the American Petroleum Institute, the records of BP employee John Lamping, and documents relating to the environmental assessment of other Amoco refineries. In reply, BP raised various objections to the requests. Then, in April 2007, the Plaintiffs sent a "golden rule" letter to BP again demanding the documents. They followed this in May 2007 with a motion to compel the production of the documents.

The trial court heard the matter in July 2007 and ruled that the documents were subject to discovery and must be produced by July 20, 2007. After receiving that ruling, the Plaintiffs then filed a request for sanctions, contending that BP had failed to produce the requested documents by the date ordered by the court. Instead, BP advised the Plaintiffs that the documents were available in offices in Cleveland, Ohio, and Wilmington, Delaware. There were about 45 boxes of documents available. At this point, the Plaintiffs requested the trial court enter whatever sanctions it deemed appropriate and specifically requested that the court order BP to immediately deliver all the documents to the Plaintiffs' office at BP's expense.

The trial court ordered BP to immediately copy and deliver to the Plaintiffs' office copies of all documents at BP's expense. After the trial court issued that order, BP filed a notice of compliance and explained it had experienced a variety of issues in compiling, copying, and transferring documents saved on microfilm. BP also contested the motion for sanctions.

At this point, the Plaintiffs filed another motion claiming that BP had still failed to produce numerous documents and had lied to the trial court. The Plaintiffs also complained that some of the documents recently produced were related to their first request for production of documents. Then, in the second week of August, the Plaintiffs

filed five more motions for discovery sanctions against BP. The separate motions involved various subjects, such as three rolls of microfilm that were not copied when an employee was on vacation and BP's failure to designate a corporate witness as required by K.S.A. 60-230(b)(5). The Plaintiffs again asked that all documents withheld based on attorney-client privilege be produced.

At the hearing on these motions, the Plaintiffs' counsel agreed that a number of the late produced documents had been produced previously but came from a different storage site, although some had additional notes written on them. BP's counsel responded in detail concerning the manner in which documents were produced and where errors were made. BP also argued that some documents were produced early in the case but the Plaintiffs' attorneys did not tag them for copying. BP reported that it had spent over $50,000 already in its efforts to comply with the order compelling discovery.

The trial court ruled in a straightforward fashion. After accepting the blame for not appointing a special master to monitor and handle discovery issues for this massive case, the trial court refused to strike BP's pleadings as a sanction. Likewise, the trial court refused to strike the privilege log. The trial court did order that any document produced after July 17 would be deemed authenticated and its relevancy would be evaluated at trial. The trial court also noted that if the Plaintiffs wanted to list a statement of costs associated with the discovery issues, the judge would consider it. The trial court then spent time discussing the K.S.A. 60-230(b)(5) deposition issue and the identity of anybody else that the Plaintiffs wanted to depose and pressed the Plaintiffs for an explanation of how the information they had received prejudiced them. After that, the trial court declined to order further sanctions.

Sanctions should be designed to accomplish the objects of discovery rather than for the purpose of punishment. *Shay v. Kansas Dept. of Transportation*, 265 Kan. 191, 194, 959 P.2d 849 (1998). The dismissal or granting of a default judgment is a drastic

55

remedy to impose as a discovery sanction and should only be used as a last resort when other lesser sanctions are clearly insufficient to accomplish the desired outcome. *Canaan v. Bartee*, 272 Kan. 720, 727, 35 P.3d 841 (2001).

From our reading of the record, the Plaintiffs filed a request for production of documents in April 2007 and waited 6 weeks before trial to file a motion to compel. While it is true that BP was late in delivering documents, it produced a huge number of documents in response to the trial court's order compelling discovery. During this process additional documents were produced that were responsive to earlier document requests. But BP made a showing that all but 14 of the new documents had been previously produced from another source. As far as we can tell, the Plaintiffs complain that the trial court refused to permit depositions of other witnesses related to the K.S.A. 60-230(b)(5) depositions about the relationships between the corporations, not depositions about the new documents.

After examining the record on appeal and the extensive rulings made by the trial court in response to the seven different motions for sanctions, we quite frankly see no abuse of discretion. This was obviously an important stage of this proceeding, and the district judge worked tirelessly to ensure that discovery would take place. No doubt the trial court could have used a special master here, as the judge opined, but one was not appointed. We do not believe that there was an abuse of discretion that would call for a new trial in this particular case based upon the late production of documents by BP.

This matter was tried to the jury for 17 weeks. The Plaintiffs have not convinced us that they have been forced to abandon some reasonable argument based on this "late production" of documents. We recognize that the Plaintiffs received a huge number of documents before trial. But our review of the record convinces us they were able to overcome this disadvantage with skill and zeal.

We cannot agree that refusing to strike BP's pleadings and to enter a default judgment against BP was an abuse of discretion.

*Cross-examination about Industrial Commission meetings*

The Plaintiffs also complain about the trial court permitting BP's attorney to use notes from the Neodesha Industrial Commission meetings to impeach the credibility of Peitz, the owner of Neodesha Plastics, Inc. Neodesha Plastics, Inc. is a named plaintiff. The Plaintiffs contend that Peitz was not present at the meetings and the meeting notes were improperly used to impair Peitz' credibility. Again, the Plaintiffs argue this without citing any legal authority other than K.S.A. 2006 Supp. 60-460.

In order to effectively rule upon this issue, we must consider all of the circumstances. During his direct testimony, Peitz testified that his business employed over 200 employees. He stated that the City of Neodesha was important to him and his company was an excellent corporate citizen in the community. Peitz stated that he needed more space for his expanding company but he was unwilling to expand at the current industrial site because of the contamination. He did admit that when he bought the building in 1995, the City did not tell him there was contamination on the property. He testified that he had considered moving because of the contamination and the inability to expand his business at that site. He also testified that there was no other reason he would move his business, but as a contingency plan he has purchased a right to buy 80 acres on U.S. Highway 400, where he could get more reasonable utility rates.

In turn, during cross-examination Peitz was asked about the potential new site he mentioned on direct examination. At one point during cross-examination, Peitz was asked to review minutes from a December 2006 Industrial Commission meeting. The trial court overruled the Plaintiffs' objection based on hearsay and relevancy. The trial court found the document relevant and that Casey Lair had authenticated it in his testimony. In

57

addition, J.D. Cox, another attendee at the meeting, was the Plaintiffs' designated representative throughout the entire trial; thus, he was available to be cross-examined about the minutes' accuracy.

After reviewing the document, Peitz admitted he had asked nearly every City administrator to reduce the charge for his business' electricity and "alienated every [one] . . . over the price they charge me for electricity." Peitz pointed out that the meeting minutes were just statements of a number of people who speculated about what they could do to help his company and they were not his statements. Peitz also testified that he could get a better electric rate at the new location but it did not make mathematical sense to move and build a new facility to replace the current facility just for lower electric rates.

Our reading of the record reveals that BP tried to impeach Peitz' credibility about his desire to remain in Neodesha. He admitted he had discussed moving his facility elsewhere. The document in question confirms that the Industrial Commission was worried about the possibility of Peitz moving his business elsewhere. However, it appears the document had little impact beyond Peitz' own testimony and that he ably deflected any inference that his concerns about moving would be based on electricity rates rather than the contamination.

For these reasons, we do not view the document as inadmissible hearsay and, indeed, it was relevant in an attempt to impeach Peitz. We affirm the trial court's ruling upon this point. In addition, we must point out that even if the trial court erred in allowing this cross-examination, we view it as rather ineffectual and find it unlikely that it had any impact on the Plaintiffs' substantial rights.

SUMMARY JUDGMENT WAS PROPER ON THE CLAIMS OF UNJUST ENRICHMENT.

The Plaintiffs claim that Kansas law recognizes a claim for unjust enrichment based upon the expenses BP would save by leaving the contamination it created under the Plaintiffs' property. Thus, the trial court erred by granting summary judgment to BP on this point.

Generally, recovery under a theory of unjust enrichment may occur only after proof of:

- a benefit conferred upon the defendant by the plaintiff;
- an appreciation or knowledge of the benefit by the defendant; and
- the acceptance or retention by the defendant of the benefit under such circumstances as would make it inequitable for the defendant to retain the benefit without payment of its value. *Haz-Mat Response, Inc. v. Certified Waste Services Ltd.*, 259 Kan. 166, 177, 910 P.2d 839 (1996).

Primarily, the Plaintiffs rely on *Ablah v. Eyman*, 188 Kan. 665, 365 P.2d 181 (1961). In *Ablah*, the plaintiffs filed a replevin action seeking possession of various books, records, and other documents and personal property held by the defendant, a certified public accountant. The sheriff seized the documents and personal property identified by the plaintiffs, and the property was ultimately turned over to them. The defendant pursued a counterclaim, asserting he only possessed working papers that he had prepared while performing an audit as an independent contractor for the plaintiffs and he was entitled to sole possession of his records.

In response, the court found that the defendant had pled sufficient facts to establish title and ownership of the papers when the plaintiffs started the replevin action. In an effort to determine damages, the Supreme Court acknowledged that if the accountant's

damages were confined only to the invasion of his right to exclusive possession of his personal property, such a ruling would not take into account the benefits the plaintiffs would receive from the use of his work found in the papers. Citing the older "resulting benefit" rule, the Supreme Court stated that no one should be allowed to enrich himself unjustly at the expense of another whose property he has wrongfully detained. 188 Kan. at 678-79. Thus, the law imposes a duty to return the property and to pay the value of the use of the returned property, which may be treated as the result of an implied contract. 188 Kan. at 678-79.

We must point out that the Plaintiffs do not explain how *Ablah* and the resulting benefit rule apply to the facts of this case.

The Plaintiffs also rely on *Beck v. Northern Natural Gas Co.*, 170 F.3d 1018 (10th Cir. 1999). In *Beck*, the landowners cross-appealed, challenging the district court's ruling that the fair rental value of the Simpson formation was the proper measure of damages for both their trespass and their unjust enrichment claims. The court rejected the landowners' claims to profits the producer derived from the gas stored under their properties. 170 F.3d at 1024.

Basically, the Plaintiffs contend that BP is actually "storing" contaminants under their property and is thus unjustly enriched by failing to remove them. The Plaintiffs ignore that BP is actively engaged in the remediation actions approved by the Department of Health and the local advisory group. Thus, the question remains whether, as a matter of law, the third element of unjust enrichment can be satisfied. In other words, the question becomes whether under such circumstances it is inequitable for BP to retain the benefit without payment for its value. See *Haz-Mat Response, Inc.,* 259 Kan. at 177.

We view this as an equitable claim and, generally, an equitable remedy is not available when an adequate remedy exists under another legal claim. See *Nelson v.*

60

*Nelson*, 288 Kan. 570, 597, 205 P.3d 715 (2009). We question whether this is "storage." After all, the testimony indicated these "plumes" were all moving. In any event, the remedies of law for negligence, nuisance, and violations of K.S.A. 65-6203 were all available to the Plaintiffs to attempt their recovery.

We see no error in the trial court granting summary judgment to BP on this point.

THE VERDICT WAS NOT CONTRARY TO THE WEIGHT OF THE EVIDENCE.

For this issue, the Plaintiffs contend the trial court erred in denying their motion for a new trial on their claim that the jury's verdict, especially on the strict liability and trespass counts, was contrary to the evidence. They argue that no reasonable juror could find that BP was not strictly liable for the contamination of the groundwater and that a trespass occurred.

We turn to *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, Syl. ¶ 12, 266 P.3d 516 (2011), for guidance of our review on such questions:

> "When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of the appellate court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal."

We are not persuaded to order a new trial with respect to this issue for several reasons. First, the Plaintiffs' discussion concerning strict liability limits itself to the rejected *Koger* standard that strict liability exists for groundwater pollution without applying any of the *Williams* factors. This position was explicitly rejected by the Supreme Court in *Neodesha I.* 295 Kan. at 313-19.

61

In this argument, the Plaintiffs now fail to refer to any of the Restatement (Second) of Torts factors. Additionally, our Supreme Court in *Neodesha I* did review the evidence under the Restatement factors and found the matter was clearly one for the jury to decide. 295 Kan. at 323-25. We certainly cannot alter that holding.

Concerning the continuing trespass claim, the Kansas Supreme Court has held:

"'The concept of trespass should be used, if at all, only where defendant intends to have the foreign matter intrude upon the land , or where defendant's "act is done with knowledge that it will to a substantial certainty result in the entry of foreign matter."' [Citation omitted.] Liability for a continuing trespass is premised on the original intrusion being trespassory. [Citation omitted.] Thus, if the original intrusion is not trespassory, mere knowledge that a substance reached the land of another is insufficient to establish a continuing trespass." *United Proteins, Inc. v. Farmland Industries, Inc.*, 259 Kan. 725, 729-30, 915 P.2d 80 (1996).

In conformity with this ruling, a panel of our court held that when a claim of trespass is based on foreign matter intruding on another's land, the plaintiff must show that "the defendant intended the foreign matter to intrude on the plaintiff's land or that the defendant performed the act with knowledge that the act would, to a substantial certainty, result in the foreign matter entering the plaintiff's land." *Muhl v. Bohi*, 37 Kan. App. 2d. 225, 229-30, 152 P.3d 93 (2007).

The statute of repose bars the Plaintiffs from claiming trespass with respect to actions taken while the refinery was operational. There is no evidence in this huge record on appeal that we can find that suggests BP or its predecessors intentionally released foreign matter onto or under the property of another.

Put simply, the Plaintiffs are in an unenviable position of making claims long after the refinery closed. The law bars any legal liability resulting from the actions or failure to

62

act during the refinery's operation. For example, assuming there was contamination in the soil when the refinery was closed, it could not constitute a trespass when the site was quit-claimed to Neodesha for an industrial park because the pollutants were already there. Even the Plaintiffs' experts did not opine when the pollutants started to spread from the property.

Viewing the record in the light most favorable to BP, the prevailing party, as required by *Wolfe Electric, Inc.*, 293 Kan. 375, Syl. ¶ 12, there is adequate evidence in the record that shows BP's remediation activities after the refinery closed were such that BP did not know its contamination had spread to other properties or that there was a substantial certainty such dissemination would occur. We see no reversible error here.

ATTORNEY MISCONDUCT.

The Plaintiffs contend that BP's attorneys conducted themselves in such an unprofessional, prejudicial manner that the trial court should have granted the Plaintiffs a new trial because of this professional misconduct. Basically, the Plaintiffs complain that BP's attorneys

- failed to timely produce discovery documents;
- took contrary positions during the trial concerning RETEC's agency status;
- attempted to decertify the class in the middle of the trial;
- refused to cooperate in drafting jury instructions and unprofessionally vilified the Plaintiffs and their counsel; and
- tampered with some depositions.

The major purpose of the introduction of evidence at trial is to arrive at the truth. *Hurlburt v. Conoco, Inc.*, 253 Kan. 515, 533, 856 P.2d 1313 (1993). The jury gleans the facts from that evidence, and the jury is to apply the facts to the law as instructed by the

63

court. Constrained by our ethical rules, counsel must present his or her client's case in the light most favorable to the client. We recognize that these are hard-fought contests.

We will not readdress the issue of late production of documents since we have dealt with this previously. We will now turn to the question of "inconsistent positions" taken by BP regarding RETEC.

We understand that at one point prior to trial, the Plaintiffs argued that the "Book of Common Prayer" was not privileged because it had been provided to RETEC, the contractor hired to perform soil and water sampling at the site. Later, during the trial at a bench conference, counsel for BP argued that RETEC's status as a contractor did not allow the Plaintiffs to forego foundation requirements, and counsel lodged an objection to RETEC's documents based on foundation or hearsay grounds. The court excused the jury. Once outside the presence of the jury, the trial court noted that defense counsel might not have been aware of a pretrial ruling on RETEC's status as an agent of BP for privilege purposes and the trial court would not change that ruling.

We do not see how this denied the Plaintiffs a fair trial. This large record shows there were a number of bench conferences throughout the trial, some of which were so long that the trial court excused the jury early in the afternoon so the issue could be addressed for the remainder of the day. It is true that BP's counsel took an inconsistent position, but we see no harm coming from it, especially in light of how the trial court adeptly handled the miscue.

Next, it is true that in July 2007, just before the trial but after the close of discovery, BP moved to decertify the class because of a claimed lack of commonality and typicality across the range of class members, which included: governmental entities, individuals, and churches. The trial court, once again, denied this motion. But in October 2007, during the middle of the trial, the Kansas Supreme Court issued two decisions:

*Smith v. Kansas Gas Service Co.*, 285 Kan. 33, 169 P.3d 1052 (2007), and *Gilley v. Kansas Gas Service Co.*, 285 Kan. 24, 169 P.3d 1064 (2007). In both of those class action cases, damages among class members were not necessarily typical or similar. Based on their reading of cases, the Plaintiffs filed a motion for the creation of subclasses for purposes of deciding damages. In response, BP filed a combined motion to dismiss and decertify the class. The trial court once again refused to grant the order decertifying the class and granted the Plaintiffs' motion for the creation of subclasses.

From our vantage point, BP's position was consistent and warranted based upon the implications of the rulings in *Smith* and *Gilley*. We are not persuaded that BP's position was unprincipled or inconsistent even though it was unsuccessful. Its attempt to decertify the class was certainly not grounds for a new trial. After all, a trial court retains the ability to modify a class at any time before final judgment. *Critchfield Physical Therapy v. The Taranto Group, Inc.*, 293 Kan. 285, 308, 263 P.3d 767 (2011). As one treatise points out, the ability of a court to reconsider initial class rulings is a vital ingredient in the flexibility of courts to realize the full potential benefits flowing from the judicious use of class actions. 3 Newberg on Class Actions § 7:47, pp. 154, 159 (4th ed. 2002).

We now turn to the allegations that BP tampered with videotaped depositions. It appears to us that the trial court correctly resolved this issue. The trial court compared the statements on the video and determined that although there were obvious redactions, the video presentation itself was consistent with the written transcript. The trial court concluded that there was no tampering of the depositions, and we agree.

We believe that attorneys on both sides zealously represented their clients. Both sides filed a large number of motions regarding numerous discovery, evidentiary, and trial procedure issues. The depositions used as evidence in this case display aggressive questions by attorneys from both sides. A fair reading of the briefs leads us to conclude

that there is some animosity between counsel. But, we do not see any grounds for ordering a new trial here. The matters that the Plaintiffs complain about on this point did not deny them a fair trial.

CONCLUSION.

This was a massive lawsuit in every respect. Huge claims involving many subclasses were tried, requiring weeks of testimony and hundreds of exhibits. Evidence was often complicated and technical. In the end, though, the Plaintiffs could not prove their case to the satisfaction of the jury.

In this appeal, the Plaintiffs ask us to overturn the trial court and grant them a new trial. Their claims of error are unconvincing. We commend the patience and skill displayed by the trial judge who had to struggle with this huge case. The errors we have noted do not compel us to order a new trial.

Affirmed.