NOT DESIGNATED FOR PUBLICATION

No. 114,880

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

TRUDY CAMPBELL,
*Appellant*,

v.

THE BOARD OF COUNTY COMMISSIONERS
OF SEDGWICK COUNTY, KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN J. O'CONNOR, judge. Opinion filed October 21, 2016. Affirmed.

*Brian D. Pistotnik*, of Pistotnik Law Office, LLC, of Wichita, for appellant.

*Alan R. Pfaff* and *Nathan R. Elliott*, of Withers, Gough, Pike, Pfaff & Peterson, LLC, of Wichita, for appellee.

Before PIERRON, P.J., ATCHESON and ARNOLD-BURGER, JJ.

*Per Curiam*: Trudy Campbell's car was rear-ended by a police SUV while stopped at a stoplight on November 27, 2012. She reported no injuries at the scene of the accident. Several hours later, she went to the emergency room for pain in her neck and back. Over the next few years, she saw several medical professionals regarding pain in her lower back, eventually getting surgery on her lumbar spine. Campbell sued Sedgwick County to recover medical costs as well as lost income. The jury returned a verdict of no damages. Campbell appeals arguing (1) the verdict was contrary to the evidence; (2) one of Sedgwick County's expert witnesses failed to disclose portions of his testimony prior

1

to trial; (3) one of Sedgwick County's expert witnesses testified outside his area of expertise and erroneously relied on literature in that field, and (4) jury misconduct invalidated the verdict.

Campbell first experienced back pain during her pregnancy with her first son in 1998, but the pain went away after she gave birth. From 1999 to 2006, she did not experience any back problems and was an active runner. She was also an avid horseback rider for much of her life and owned a number of horses. In 2007, she reported a sharp pain in her back, radiating down into her left knee. She had no known injury and had been experiencing pain for 6 months at the time she sought treatment. Her doctor sent her for an MRI and a culture. The MRI indicated that she had degenerative disc changes at her L3-L4 and L4-L5 vertebrae and the changes at the L4-L5 vertebrae were severe. The report also noted: "At the level of L4/5 there is a left lateral disc herniation which causes mass effect upon the exiting nerve sleeve." After the MRI and culture, her doctor diagnosed her with a kidney infection. He prescribed her some medicine and gave her an exercise to help with the back pain. The pain went away after about 2 weeks.

She did not experience back pain again until after the collision in November 2012. During this time period, she had only gone to the doctor about possible lice, to get an allergy shot, and about a lung illness. Her medical records from this period do not indicate any complaints about back pain or problems.

The car accident at issue occurred at 1:51 p.m. on November 27, 2012. At the time of the collision, Detective Jason Burley was working for the Sedgwick County Sheriff's Office. It was his first day back to work after missing 5 days due to pneumonia. His family doctor had cleared him to return to work. He had never had any previous problems with sleepiness at work.

Detective Burley testified he stopped behind Campbell's car at a stoplight. While he could not estimate the exact distance between his SUV and Campbell's car, he could see the bottom of the car's bumper. He admitted this was too close because he had been trained to leave enough distance that he could see the bottom of the tires. While stopped, Detective Burley closed his eyes and nodded off. His foot came off the brake and his SUV rolled forward. By the time he realized what was happening and tried to push on the brake, it was too late.

After the collision, Detective Burley spoke briefly with Campbell in the street. He asked her if she was injured, and she said she was not. He also asked if Campbell's son was injured, and he was not. Because they were in the middle of a busy roadway, Detective Burley asked if they could move to a nearby parking lot. When they got to the parking lot, he again asked Campbell if she was injured, and she said she was not. Detective Burley saw Campbell moving around freely after the accident. He did not see any indication that she had been injured.

Campbell testified she was sitting at a stoplight when her car suddenly jerked forward. She was in a loaner car at the time and was trying to figure out how to use the radio. She was bent over and hit her head on the steering wheel. She also felt a sharp pain in her leg, but it did not occur to her at the time that something was seriously wrong.

Officer John Scaglione prepared the accident report. According to the accident report, one of the bolts from the front push bumper on Detective Burley's SUV was missing. Detective Burley testified that "as far as [he] knew" the bolt had been there before the accident, and he believed the collision had broken the bolt.

According to Campbell, she felt stiff and somewhat numb when she sat back down in her car. She left the scene of the collision and went to have lunch with her son. Campbell reported that at the restaurant she began to have an "all-over aching kind of

3

feeling," with specific pain in her butt cheek and continuing down her leg. Her condition got continuously worse over the course of an hour.

Concerned that she might have a head injury, Campbell went to the emergency room at Wesley Medical Center. The emergency patient record shows an arrival time of 4:51 p.m., approximately 3 hours after the accident. Under "Subjective Assessment," the record states "PT was restrained driver in MVC. PT was rear ended by another car travelling 30 mph. No airbag deployment. PT hit head on steering wheel. C/O neck, back and facial pain, and right shoulder." Campbell testified at trial she had overheard a police officer say that the last recorded speed on Detective Burley's SUV was 28 miles per hour.

The record also shows Campbell reported moderate tenderness in her neck and upper back and severe tenderness in her lower back. CT scans of Campbell's neck and back did not show any signs of acute fracture or dislocation of the spine, though they did show degenerative changes in her lumbar spine. Degenerative changes are "changes seen on bones or soft tissue . . . due to genetics and the aging process." The records also indicate that in the emergency room Campbell removed her cervical collar and sat up despite being instructed not to do so. Dr. Kevin Potter diagnosed Campbell with strains of her cervical, thoracic, and lumbar spine. She was given some pain pills and told to follow up with her regular physician.

Campbell saw a number of healthcare providers. She saw Dr. David Hufford of Mid-America Orthopedics on December 6, 2012. Dr. Hufford noted that Campbell's CT scans of her lumbar spine showed some degenerative changes to her lumbar spine without any acute injury. His assessment was a motor vehicle collision with strain of the cervical and thoracic spine. He set her up for physical therapy.

Campbell had her initial physical therapy exam on December 17, 2012. She did not show up for six out of her next nine physical therapy appointments. On her sixth no

4

show, she was discharged for noncompliance on January 16, 2013. Campbell testified the physical therapy was not helping her and was actually making her pain worse, so she stopped showing up. The daily notes for the last physical therapy appointment she attended before being discharged note "No complaint of pain with [therapeutic exercises] today."

Dr. Drew Schultz, a family medicine practitioner, saw Campbell on January 18, 2013, regarding a headache. Campbell told him she had been rear-ended by a car going 30 mph. Dr. Schultz saw Campbell again on September 23, 2013, diagnosed her with "low back pain" and "radiculopathy" and ordered an MRI of her lumbar spine. Radiculopathy "is a term used in medicine whereby one has symptoms along a specific well-defined nerve."

Premier Open MRI & CT performed an MRI on Campbell on September 24, 2013. The radiologist reported there was a "[l]arge broad-based herniation at L4-L5 as described with advanced degenerative disk changes." Broad-based herniation may impinge on both sides of the nerve root.

Dr. Tim Warren, a of chiropractor, also performed an independent medical evaluation (IME) on Campbell on September 27, 2013, to determine whether she needed further treatment and whether she would be able to return to work. Dr. Warren testified at trial that Campbell presented with low back pain that radiated into the left thigh. Dr. Warren noted that the radiculopathy, *i.e.*, pain radiating from one point to another, started in August 2013. He could not find any history as to why it started at this point. He testified that degenerative changes after the accident could have caused the radiculopathy problems to start later. Campbell told Dr. Warren that she had not experienced any back problems prior to the accident. Dr. Warren diagnosed Campbell with a lumbar invertebral disc disorder with myelopathy. He found that Campbell had been disabled from the date of the accident and the degenerative changes in her spine were an accessory finding.

5

At the time of the IME, Dr. Warren did not know about Campbell's MRI from 2007. At trial, Dr. Warren testified he had later seen the 2007 MRI. He told the district court that Campbell had a herniated disk with some arthritic changes and this could leave her more susceptible to injury. She could possibly be injured with a lower amount of force due to these changes in her spine. He also testified that car accidents produce horizontal force and a horizontal force can cause the kind of injury Campbell sustained. He testified that car accidents are not the only means of potential trauma and that something like riding horses would be an example of wear-and-tear type trauma that someone could experience. Even after seeing the 2007 MRI, Dr. Warren still concluded the accident in November 2012 had caused Campbell's injuries.

On October 22, 2013, Campbell saw Dr. Matthew Henry, a neurosurgeon at the Abay Neuroscience Center. Dr. Henry testified at his deposition that based on Campbell's reported medical history, the films she provided, and a series of physical tests, he diagnosed her with a herniated disc at the L4-L5 vertebrae with at least partial L4 and L5 radiculopathy. He stated that Campbell told him she had no significant history of back pain prior to the accident. At the time of treatment, Dr. Henry had a copy of Campbell's 2013 MRI. He recommended medication and epidural shots. If that did not work, they would consider surgery.

After Campbell's first visit with Dr. Henry, Dr. Milton Landers gave her lumbar steroid epidural injections on December 3, 2013, and February 19, 2014. In his notes from December 3, 2013, he noted Campbell had not brought her MRI despite being told to do so. On February 19, 2014, Dr. Landers noted "MRI once again not brought in by patient. She has been told at least 3 times that she needed to have her MRI today, and once again, she failed to do so." Dr. Landers did not testify at trial.

6

Campbell returned to Dr. Henry for surgery on her spine in May 2014. Dr. Henry performed a L4-L5 anterior lumbar interbody fusion on May 5, 2014. A month after her surgery, Campbell reported to Dr. Henry that she "rate[d] her improvement at 100%," though he later noted "this is probably being generous."

Dr. Henry was deposed shortly before trial, and his deposition was played for the jury. During his deposition, Campbell's counsel questioned Dr. Henry regarding Campbell's 2007 MRI. Dr. Henry stated that was the first time he had heard of the 2007 MRI or of any back pain Campbell had experienced prior to the car accident. Campbell's counsel then presented Dr. Henry with a side-by-side comparison of Campbell's 2007 MRI and 2013 MRI, and Dr. Henry noted there was definitive worsening between the two MRIs. He stated degenerative disease could have led to the herniated disc but ultimately concluded that "[b]ased on her story and the impressiveness of the MRI, I'm going to say that her symptoms, her story corresponds with a motor vehicle crash."

Dr. Pedro Murati performed another IME on Campbell on November May 28, 2014. Campbell had told Dr. Murati a car had rear-ended her while she sat at a stoplight and she "shot through the intersection." She also told Dr. Murati she did not have any significant preexisting injuries to her lower back before the accident. Dr. Murati did not have any radiological films available to review. He determined that Campbell's previous and current missed work was a result of the accident. Dr. Murati did not testify at trial.

Dr. John McMaster testified for Sedgwick County that he performed another IME on Campbell on May 28, 2015, after Dr. Henry had performed surgery on her spine. Dr. McMaster concluded the accident in November of 2012 did not cause any injury to Campbell's lower back. He based his opinion on Campbell's medical records, the dash cam video of the accident, and pictures of the damage to the cars. At the time of this IME, Dr. McMaster had the radiologic reports from both of Campbell's MRIs but did not have the actual films.

In Dr. McMaster's IME, which was included in his expert disclosure, he concluded: "Attributing any collision related musculoskeletal or low back injury to the minimal transient forces transmitted in this particular incident represents unscientific and medically unverifiable speculation." He noted the only objective data in the case were Campbell's medical records, accident and vehicle damage reports, "and a variety of biomechanical variables." Campbell filed a motion in limine to prevent Dr. McMaster from testifying regarding the subject of biomechanics, which Campbell argued was outside his area of expertise. The district court denied this portion of the motion.

Dr. McMaster also testified at trial. He told the court he was a medical doctor in Kansas. He received his medical degree from Louisiana State University in Shreveport. He was board certified in family medicine and emergency medicine and was a member of the American College of Emergency Physicians and American Academy of Disability Evaluating Physicians. He had been involved in emergency medicine full-time since 1985 and was also a consulting medical director for the Kansas State Board of Healing Arts.

Dr. McMaster testified that throughout medical school, he learned about the effects of forces on body parts. He had also taken 1 year of physics as a prerequisite to medical school. In the past 10 to 20 years, he had undergone extensive education in the area of biomechanics "in order to familiarize myself with all of the forces that can injure a body so as to use [his] scientific and medical knowledge in educating people when they're injured." In the last 10 to 15 years, since he started performing independent medical examinations, he has dealt with personal injury, "specifically the forces involved in motor vehicle accidents and airplane accidents with respect to human occupants." He had sought out continuing education courses that would further his education in this area and "bring to [his] forefront the medical literature that supports or refutes injuries."

8

Dr. McMaster testified that the force generated by the car accident was insufficient to cause injury to Campbell's lower back. In reaching his opinion, Dr. McMaster relied on "peer-reviewed medical literature that have identified the amount of forces that are necessar[y] to cause injury to different body parts specifically in rear-end accidents and with respect to whiplash injuries." Specifically, Dr. McMaster relied on "Does Minor Trauma Cause Serious Low Back Pain/Low Back Illness?" by Eugene Carragee, who is a professor of "either . . . orthopedics or neurosurgery" at Stanford Medical School. Dr. McMaster testified the article "[had] been accepted in a peer-reviewed medical journal and . . . represents a document that a majority of the medical profession would recognize as authoritative." The study looked at patients over a 5-year period after a trauma and concluded that "minor trauma does not appear to increase the risk of serious low back pain episodes or disability."

At trial, Dr. McMaster defined the term "biomechanics" as "[having] to do with how biological organisms interact with the forces that are placed upon it, be they mechanical or environmental forces." He testified that in a case like Campbell's, "the biomechanical variables that can impact injuries to a human being include . . . the forces involved in the impact, how those forces are distributed and/or dissipated, also what restraints are available." Over Campbell's objection, he testified that a lot of peer-reviewed medical and scientific literature has established pretty good criteria for what forces are necessary to cause bodily injury. According to Dr. McMaster, these studies have shown that forces from a low-speed, rear-impact car accident when transmitted to a person restrained in a vehicle are much less than the G forces generated on a body from many daily activities. He also discussed the difference between vertical and horizontal forces. He stated horizontal forces like a rear impact would need to cause significant deformation to the vehicle to injure someone's back.

Dr. McMaster also testified that Campbell had degenerative changes in her lumbar spine. These changes were "change seen on bones or soft tissue . . . due to genetics and

9

the aging process." He added the "[a]dvancement of degenerative changes is expected with the aging process as well as continued activity involving that body part."

Campbell also presented a loss of income claim. She presented testimony from James Lubey, who ran his own consulting firm. He worked with the National Guard Association of California and was president of the National Guard Executive Directors Association. Lubey hired Campbell in 2008 to do publicity and entertain at various events throughout the country. In 2012, Lubey paid Campbell $164,075 for work she had performed prior to her accident. Two weeks after the accident, Campbell was no longer able to appear at events for Lubey and had not performed any work for Lubey up until the time of the trial.

Lubey had provided a series of e-mails to Campbell's lawyer documenting possible performances she could have attended after the accident. One of the e-mails was dated February 7, 2012, approximately 9 months prior to Campbell's accident. Lubey sent the e-mail to Campbell listing a number of possible events in February, March, and April of 2013. Lubey said in the e-mail that "[s]everal states don't want to agree on big bucks events unless they were sure you can perform. Nonetheless, we have to move forward." In the next paragraph Lubey said, "I hope you will be well soon." In the closing of the e-mail, Lubey again said, "I hope you are feeling better." When asked what would have prevented Campbell from being booked for these events, Lubey testified her back injury did.

When Sedgwick County pointed out that this e-mail was sent prior to the accident, Lubey told the court, "I am not sure what it's talking about. I'm making an assumption that it was the back, but that didn't happen until later . . . ." Lubey testified he would have only been sending e-mails about potential jobs after Campbell's accident, but he also believed the date on the header was correct. He told the court he had not changed the date.

10

The jury returned a verdict of no damages. After the verdict, one of the jurors contacted Sedgwick County alleging several instances of juror misconduct. Campbell filed a motion for a new trial, alleging jury misconduct and that the verdict was contrary to the evidence. The district court denied the motion. Campbell appeals the verdict and the denial of her motion for a new trial.

Campbell first argues the verdict in the case was contrary to the evidence and the district court abused its discretion in not granting a new trial. Specifically, she argues the evidence supported an award for the costs of emergency medical treatment at Wesley Medical Center on the day of the accident. Sedgwick County argues that evidence supports the verdict of no damages. Sedgwick County further asserts the jury returned a negative finding and an appellate court generally cannot disturb a negative finding on appeal.

When a party challenges a jury verdict as being contrary to the evidence, the appellate court does not weigh the evidence or pass on the credibility of the witnesses. If the evidence, when considered in the light most favorable to the prevailing party, supports the verdict, the appellate court should not intervene. *Unruh v. Purina Mills*, 289 Kan. 1185, 1195, 221 P.3d 1130 (2009); *City of Neodesha v. BP Corporation*, 50 Kan. App. 2d 731, 782, 334 P.3d 830 (2014), *rev. denied* 302 Kan. 1008 (2015).

Viewing the evidence in the light most favorable to Sedgwick County, the evidence appears to support the verdict. Sedgwick County admitted fault in this case, and Campbell clearly underwent years of medical treatment for lower back issues. Nonetheless, the evidence in the case did not definitively show a causative link between these two facts, primarily due to questions Sedgwick County raised regarding Campbell's credibility.

11

The collision occurred on November 27, 2012. Detective Burley's dash cam video showed the collision occurred at a very low speed. At the scene, Campbell reported she was not injured. She then went to lunch with her son.

Several hours later, Campbell arrived at the emergency room at Wesley Medical Center complaining of neck and back pain. Campbell told medical staff that she was in an accident, and the car that hit her was going 20-30 mph. She similarly told Dr. Schultz the car that hit her was going 30 mph. She also told Dr. Murati that a car rear-ended her car and she "shot through the intersection." Campbell explained this misinformation at trial by testifying she had overheard one of the officers say Detective Burley had been going 28 mph. The dash cam video clearly demonstrated, however, that Detective Burley's SUV had begun moving from a complete stop and hit Campbell's car within a few feet. Her car then lurched forward a few feet into the crosswalk.

Campbell points out that most of the medical professionals she saw credited her injuries to the car accident. Their diagnoses, however, were at least partly dependent on her recitation of her prior medical history as well as her current symptoms. She told her caretakers she was coming to them regarding an injury sustained in a car accident. Dr. Warren, Dr. Henry, and Dr. McMaster all agreed that she had a degenerative back condition related to age that can naturally worsen with time or normal wear and tear. In 2007, she had an MRI after experiencing back pain that radiated down her left leg. That MRI showed she had a herniated lumbar disc caused by a degenerative condition. Nevertheless, she never disclosed this information to any of the professionals she saw for treatment after the accident, even when asked if she had experienced prior back problems.

Sedgwick County also points to the e-mail Lubey presented from February 2012. The e-mail was discussing possible upcoming jobs Campbell might not be able to do because she was unwell. The e-mail was dated 9 months before the accident. Neither

12

Lubey nor Campbell were able to explain why the e-mail was dated February 2012 or what injury or sickness it was referring to.

Based on the evidence presented at trial, the jury apparently weighed Campbell's credibility and did not believe her claim that the accident caused her lower back issues. Given the evidence of a prior degenerative condition and Dr. McMaster's causation opinion, the jury also appears to have given little weight to the opinions of the other doctors that Campbell's problems resulted from the accident. Credibility of evidence is strictly an issue for the jury, and appellate courts do not pass on the credibility of witnesses. See *Sack v. Rapp*, No. 98,679, 2008 WL 447815, at *6 (Kan. App. 2008) (unpublished opinion) (affirming negative finding of jury in car accident injury case based on credibility determinations regarding plaintiffs and other witnesses).

Sedgwick County additionally argues that the jury in this case returned a negative finding.

> "A negative finding indicates that the party upon whom the burden of proof is cast did not sustain the requisite burden, and on appeal the negative finding will not be disturbed absent proof of an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice." *EF Hutton & Co. v. Heim*, 236 Kan. 603, 610, 694 P.2d 445 (1985) (upholding jury's finding that plaintiff failed to prove affirmative defense).

Campbell has not demonstrated that there was undisputed evidence demonstrating causation in this case or that bias, passion, or prejudice influenced the jury.

Campbell also argues the district court abused its discretion in not granting a new trial based on this issue. It is within the discretion of the trial court to grant or deny a new trial under K.S.A. 2015 Supp. 60-259(a). A ruling on a motion for new trial will not be disturbed on appeal except upon a showing of abuse of discretion. *Miller v. Johnson*, 295

Kan. 636, 684-85, 289 P.3d 1098 (2012). As discussed above, the verdict was not contrary to the evidence, thus, the court did not abuse its discretion in denying Campbell's motion for a new trial.

Campbell next argues the district court abused its discretion when it allowed Dr. McMaster to testify regarding the films from her 2007 and 2013 MRI films. She asserts Dr. McMaster did not file a supplemental disclosure stating his opinion based on viewing the films. Furthermore, she contends the testimony unfairly surprised her because in his initial disclosure Dr. McMaster stated he did not have the films.

Sedgwick County argues the district court did not abuse its discretion because Dr. McMaster's initial disclosure adequately set forth his causation opinion and his testimony at trial was consistent with that opinion. It also contends Dr. McMaster's testimony regarding the MRIs was only offered as rebuttal testimony to Dr. Henry's prior testimony about the same films. Finally, Sedgwick County posits any error in allowing Dr. McMaster to testify was harmless.

An appellate court reviews the admission or exclusion of opinion testimony under K.S.A. 20-1506 Supp. 60-456 for an abuse of discretion. See *Manhattan Ice & Cold Storage v. City of Manhattan*, 294 Kan. 60, 70, 274 P.3d 609 (2012). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) the action is based on an error of law; or (3) the action is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015).

In Dr. McMaster's initial expert disclosure, he concluded he was "unable to causally relate the occurrence of [Campbell's] symptomatology/complaints to the events that occurred on November 27, 2012." In reaching this conclusion, Dr. McMaster had access to radiological reports for Campbell's MRIs from 2007 and 2013. He did not have

14

the actual films. At trial, Dr. McMaster testified that since his IME of Campbell, he had seen the actual MRI images. Sedgwick County did not file a supplemental disclosure to add this information to Dr. McMaster's initial disclosure.

Under K.S.A. 2015 Supp. 60-456, expert witnesses may testify at trial. K.S.A. 2015 Supp. 60-456 provides:

"(b) If scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise if: (1) The testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case."

Expert witnesses are subject to specific rules of discovery. Parties must disclose the identity of any expert witnesses. K.S.A. 2015 Supp. 60-226(b)(6)(A). As part of this disclosure, parties must also state "[t]he subject matter on which the expert is expected to testify[, and] the substance of the facts and opinions to which the expert is expected to testify." K.S.A. 2015 Supp. 60-226(b)(6)(A). If a party has retained an expert witness specifically to give testimony in a particular case, the disclosure must also include a summary of the grounds for each opinion. K.S.A. 2015 Supp. 60-226(b)(6)(B).

Parties must make expert disclosures "at the times and in the sequence that the court orders." K.S.A. 2015 Supp. 60-226(b)(6)(C). If there is no court order, disclosures must be made at least 90 days before the start of trial. K.S.A. 2015 Supp. 60-226(b)(6)(C)(i). If a party needs to supplement a prior expert disclosure, the party must make any changes or additions at least 30 days before trial unless the court orders otherwise. K.S.A. 2015 Supp. 60-226(e)(2). If a party fails to disclose or supplement as required, "the party is not allowed to use that information or witness to supply evidence

15

on a motion, at a hearing or at a trial, unless the failure was substantially justified or is harmless." K.S.A. 2015 Supp. 60-237(c)(1).

The scheduling order in this case provided an expert disclosure deadline for Sedgwick County of June 5, 2015. The scheduling order allowed parties to make supplemental disclosures 10 days after an initial disclosure to correct an otherwise defective initial disclosure. Additionally, supplemental disclosures had to be made at least 7 days prior to the scheduled deposition of the expert witness in question unless good cause was shown. As Campbell argues, the scheduling order does not appear to apply to Dr. McMaster's circumstances. He did not have a deposition, and his initial disclosure was not defective. Thus, K.S.A. 2015 Supp. 60-226(e)(2) applied and required that Sedgwick County file any supplemental disclosures at least 30 days before the beginning of trial.

In *Foster v. Klaumann*, 42 Kan. App. 2d 634, 216 P.3d 671 (2009), the plaintiffs argued that an expert witness in a medical malpractice suit exceeded the scope of her initial disclosure by providing a new opinion at trial. The *Foster* court rejected the plaintiff's argument. First, the court noted that the expert's opinion in her disclosure and her testimony at trial related to injury to the victim's deep peroneal nerve, which was the main issue at trial. 42 Kan. App. 2d at 680. Second, the court noted that "expert disclosures are not meant to disclose every detail of testimony that an expert is expected to give." 42 Kan. App. 2d at 680. Finally, the court found that the expert's testimony was consistent with her expert disclosures and did not provide a new opinion but elaborated on the opinion in her initial disclosure. 42 Kan. App. 2d at 681.

In *Walder v. Board of Jackson County Comm'rs*, 44 Kan. App. 2d 284, 236 P.3d 525 (2010), a decedent's estate sued Jackson County for negligence in maintaining a road. The estate's expert testified in a deposition that he thought the road's collapse was due to a process called piping. The district court struck this testimony because the estate had not

16

disclosed this opinion in the required expert witness disclosure and the court found the county was unfairly surprised. The *Walder* court found the district court did not abuse its discretion and affirmed the court's decision. 44 Kan. App. 2d at 288.

Dr. McMaster's testimony is arguably more similar to the expert testimony in *Foster*. While Dr. McMaster expanded on the opinion in his initial disclosure, his trial testimony was consistent with the opinion in his disclosure. He did not provide a new opinion at trial but reiterated his conclusion that the accident did not cause Campbell's back problems. While the MRI films provided another basis for his opinion at trial, he still had access to the radiological reports when he formed the opinion included in his disclosures. Campbell does not argue that the information in the radiological reports was inaccurate or differed significantly from the information in the films. Additionally, Dr. McMaster's trial testimony was consistent with his initial disclosure, so there was no unfair surprise for Campbell as there was in *Walder*. Thus, a reasonable person could agree with the district court's decision to allow Dr. McMaster to testify regarding the MRI films.

Sedgwick County also argues Dr. McMaster's testimony was offered as rebuttal to Dr. Henry's deposition. "'Rebuttal evidence can be introduced only after the parties have closed their case in chief and is limited to issues placed in conflict by the adverse party.'" *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, 742, 822 P.2d 617 (1991). "'Rebuttal testimony is, generally speaking, evidence presented in denial of some fact which the adverse party has attempted to prove.'" 249 Kan. at 742. Under K.S.A. 2015 Supp. 60-226(b)(6)(C)(ii), parties must disclose rebuttal evidence within 30 days of the other party's disclosure.

Due to scheduling issues, Dr. McMaster testified during Campbell's case-in-chief by agreement of the parties. Sedgwick County specifically asked Dr. McMaster his opinion about the side-by-side comparison of MRIs used in Dr. Henry's deposition. As

17

Sedgwick County itself admits, however, K.S.A. 2015 Supp. 60-226 still required that it disclose the evidence even if it was rebuttal evidence. See also *State v. Cunningham*, No. 110,640, 2016 WL 97846, at *2 (Kan. App. 2016) (unpublished opinion) (State informing district court it intended to present rebuttal testimony after the testimony of a defense witness). Thus, classifying Dr. McMaster's testimony as rebuttal evidence does not save it from an untimely disclosure argument.

If allowing Dr. McMaster's testimony was erroneous, that error was harmless. Under K.S.A. 2015 Supp. 60-237(c)(1), a party who fails to properly disclose expert testimony may not rely on that testimony unless the failure was substantially justified or harmless. Dr. McMaster's testimony at trial was consistent with his opinion in his expert disclosure. Even without his testimony regarding the MRI films, the jury would still have had Dr. McMaster's opinion on causation based on the radiological reports from the MRIs. See *Frans v. Gausman*, 27 Kan. App. 2d 518, 528-29, 6 P.3d 432 (2000) (finding harmless error in allowing expert to testify to undisclosed opinion because other evidence sufficient to support verdict). The district court did not abuse its discretion in allowing Dr. McMaster to testify regarding Campbell's MRI films, and if it did, the error was harmless because the information in his initial disclosure was sufficient to support his causation opinion. Therefore, the district court is affirmed.

Next, Campbell argues the district court abused its discretion in allowing Dr. McMaster to testify regarding biomechanics. She asserts that biomechanics is outside Dr. McMaster's field of expertise. Campbell also contends the court erred in allowing Dr. McMaster to reference a study demonstrating that minor trauma does not cause lower back injuries.

Sedgwick County contends the district court did not abuse its discretion and courts in other jurisdictions have allowed medical doctors to testify regarding biomechanics in giving causation opinions. It notes that Campbell does not provide any authority for her

18

assertion that the court should not have allowed Dr. McMaster to rely on a study in testifying. Furthermore, Sedgwick County asserts Kansas has long standing-authority allowing experts to rely on authoritative literature in forming opinions.

Whether an expert witness is qualified to give an opinion on a certain subject is a matter within the broad discretion of the district court. *Southwind Exploration v. Street Abstract Co.*, 42 Kan. App. 2d 122, 129, 209 P.3d 728 (2009). In order to qualify as an expert, a witness """must show himself to be skilled or experienced in the business or profession to which the subject relates.""" 42 Kan. App. 2d at 129. Courts do not require that experts acquire skill or experience in any particular mode, and """[a] witness may be competent to testify as an expert although his knowledge was acquired through the medium of practical experience rather than by scientific study and research.""" 42 Kan. App. 2d at 129.

The Kansas Supreme Court has held that experts may give opinions on subjects outside their primary field of expertise as long as they have sufficient knowledge to render an informed opinion. For example, in *Dieker v. Case Corp.*, 276 Kan. 141, 73 P.3d 133 (2003), a professional mechanical engineer testified at trial regarding the cause of a fire in a combine. The defendant argued the engineer was not qualified because he "lack[ed] knowledge, skill, experience, and training in fire investigation." 276 Kan. at 154. On review, the *Dieker* court upheld the district court's decision to allow the expert to testify, noting his "opinion did not involve novel scientific theory but, rather, was drawn from known facts, his experience and knowledge of possible causes of fire in a machine, and the use of logic to draw a rational conclusion as to possible causation." 276 Kan. at 161. See also *Farmers Ins. Co. v. Smith*, 219 Kan. 680, 688-90, 549 P.2d 1026 (1976) (finding electrical engineer qualified to testify regarding cause of fire in mobile home); but see *Choo-E-Flakes, Inc. v. Good*, 224 Kan. 417, 419, 580 P.2d 888 (1978) (not qualifying entomologist and administrative director of several programs within the agriculture board as expert on grain milling and feed mixing).

19

Campbell argues that Dr. McMaster was not qualified to provide the causation testimony he provided at trial because he is not a biomechanical engineer. In support of this argument, she cites to cases in which courts have qualified biomechanical engineers to provide causation opinions. Campbell argues that biomechanical engineers can provide testimony regarding causation as long as they do not offer medical opinions and limit themselves to discussing how a hypothetical person's body would respond to forces. Perhaps Campbell intends for this argument to also stand for the reverse proposition that medical doctors cannot provide opinions on the subject of biomechanics. She does not, however, provide any actual authority in support of this argument.

There do not appear to be any Kansas cases in which a court qualified a medical doctor to testify as to biomechanics regarding a causation opinion. Sedgwick County does point to several cases in other jurisdictions in which courts permitted medical doctors to consider force of impact in forming a causation opinion. See, *e.g.*, *Streight v. Conroy*, 279 Or. 289, 566 P.2d 1198 (1977); *Wilson v. Rivers*, 357 S.C. 447, 593 S.E.2d 603 (2004). For example, in *Rish v. Simao*, 368 P.3d 1203 (Nev. 2016), the plaintiff argued that a defendant could not present a low-impact defense in a case involving injuries resulting from a car accident unless the plaintiff first provided testimony from a qualified biomechanical engineer. The Supreme Court of Nevada rejected this argument, noting:

> "In the absence of a specific issue concerning the speed or the nature of the impact, mandating supporting expert testimony as a prerequisite to advancing a general low-impact defense would effectively and impermissibly deprive juries of hearing any testimony regarding the nature and circumstances of the accident and any resulting injuries unless an expert first describes the accident to the jury." 368 P.3d at 1208-09-10.

The *Rish* court held that a medical doctor may offer an opinion regarding causation as long as there is a sufficient foundation for that opinion. 368 P.3d at 1209. In that case, the

20

court found the doctor had a sufficient foundation because he reviewed medical records, MRI images, and photographs of damage to the parties' vehicles. 368 P.3d at 1209.

In the present case, Dr. McMaster testified he has practiced emergency medicine since 1985. He had a year of physics as a prerequisite for medical school and studied the effects of forces on the body as part of his medical studies. He had also spent 10-20 years familiarizing himself with biomechanics and has applied what he had learned in the 10-15 years he has been performing IMEs. In forming his causation opinion as to Campbell's injuries, Dr. McMaster reviewed her medical records, radiological reports of her MRIs, the dash cam video of the accident, and photos of damage to the vehicles. Based on Dr. McMaster's education, experience, and personal knowledge of Campbell's case, a reasonable person could agree with the district court's decision to allow his testimony. Any deficiencies in his background would go to the weight of his testimony not its admissibility. See *Casey v. Phillips Pipeline Co.*, 199 Kan. 538, 548-49, 431 P.2d 518 (1967) ("Where an expert witness has disclosed a sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of degree of his knowledge goes more to the weight of the evidence than to admissibility."). Furthermore, as noted in *Rish*, preventing medical doctors such as Dr. McMaster from considering the nature of forces in collisions would considerably hamper their ability to provide meaningful causation opinions to juries. Thus, the district court did not abuse its discretion in allowing Dr. McMaster to testify regarding biomechanical variables considered in forming his causation opinion.

In forming his causation opinion, Dr. McMaster relied on both Campbell's medical records and medical literature. Specifically, he relied on a study called "Does Minor Trauma Cause Serious Low Back Pain/Low Back Illness?" by Eugene Carragee, a professor at Stanford Medical School. The article was published in the journal Spine in 2008. Dr. McMaster testified that Spine was a peer-reviewed medical journal and the

article represented a document that a majority of the medical profession would recognize as authoritative.

Campbell argues Dr. McMaster's use of Carragee's article was a violation of K.S.A. 2015 Supp. 60-456(b). She argues Dr. McMaster rendered an opinion based on facts or data not personally known to him and the study was outside his area of expertise. Campbell does not provide any authority in support of this argument. Failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue. See *University of Kan. Hosp. Auth. v. Board of Comm'rs of Unified Gov't*, 301 Kan. 993, 1001, 348 P.3d 602 (2015).

As Sedgwick County points out, expert witnesses may base opinions on authorities in their fields. In *Casey*, our Supreme Court held that "an expert witness may give his opinion though it is founded not upon personal observation but upon knowledge gained from books and treatises in the field." 199 Kan. at 547. The ability to testify based on authorities is not unlimited. In *Smart v. BNSF Railway Co.*, 52 Kan. App. 2d 486, 369 P.3d 966 (2016), the district court excluded the testimony of an expert in ergonomics who relied on industry literature in reaching his opinion. The court did not exclude the expert's testimony solely because he relied on industry literature. Instead, the court found he was unfamiliar with the specific facts of the case, had not reviewed any literature specifically for the case, and could not explain how any of the literature he cited related to the facts in the case. This court held there was no abuse of discretion in excluding that testimony. 52 Kan. App. 2d at 489-99.

Dr. McMaster's opinion is clearly distinguishable from the expert in *Smart*. Dr. McMaster reviewed Campbell's medical records, conducted an IME of Campbell, and had personal knowledge of the facts in Campbell's case. While he may not have read the Carragee study in preparation for the present case, he was able to relate the findings of

the study to the facts in Campbell's case. Moreover, the study was neither irrelevant nor outdated. See 52 Kan. App. 2d at 499 (finding some of the expert's literature irrelevant and outdated). Given that Dr. McMaster had personal knowledge of the facts of the case and was able to relate the Carragee study to those facts, his use of the study was not erroneous. Thus, the district court did not abuse its discretion in allowing Dr. McMaster to reference the Carragee study in his testimony.

Finally, Campbell argues the verdict was a result of bias on the part of the jurors. Campbell points to a series of allegations made by one of the jurors after the trial as proof of this bias. Campbell argues this misconduct on the part of the jury invalidates the verdict in this case.

Sedgwick County contends that a party may not use matters intrinsic to a jury's verdict to invalidate that verdict. Most of the juror's allegations in this case were matters intrinsic to the verdict. Sedgwick County further argues Campbell has failed to demonstrate that the jury's behavior substantially affected her rights or the verdict.

D.E., one of the jurors, contacted Campbell's counsel the day after the jury returned the verdict. D.E. felt the jury foreman had coerced the other jurors into finding for Sedgwick County. The jury foreman supposedly claimed he had been up until 2 a.m. the night before deliberations thinking about the case. D.E. speculated he was up preparing a "spiel" about why he thought Campbell was lying, but the foreman did not appear to have stated this was the reason. D.E. also claimed the foreman had concealed the fact that he was an insurance agent.

D.E. said that after deliberations she heard the foreman tell someone that the jury had saved the county a half million dollars. The foreman then turned and asked the judge if he could now get the street in front of his house fixed.

23

D.E. admitted she had done online research regarding "bolt strength" during deliberations. This pertained to the missing bolt in the bumper of Detective Burley's SUV. She was the only one who looked up outside information, and the other jurors reprimanded her for doing so. She also claimed the other jurors had speculated as to why Campbell's son had not testified. She claimed the foreman had said it was because Campbell was lying and the boy would have to testify against his mother.

Campbell filed a motion for a new trial based on jury misconduct. In its response, Sedgwick County included an affidavit from M.M., the jury foreman. M.M. stated that on Thursday and Friday, the jurors shared their thoughts. On Friday, D.E. attempted to share her online research, but another juror cut her off before she was able to do so. M.M. stated he did not cut off any jurors, he did not coerce anyone, and the jury reached its decision based on the evidence at trial. Specifically, the jury considered Campbell's lack of credibility, the e-mail presented by Lubey, the 2007 MRI, and Campbell's prior active lifestyle. M.M. also testified the statements he made regarding saving the county money and getting his street repaired were in jest. Sedgwick County also included M.M.'s juror questionnaire and a portion of voir dire in which he had disclosed that he sold insurance.

Sedgwick County later supplemented its response with an affidavit from another juror, B.B. B.B. stated that another juror stopped D.E. before she could reveal the results of her online research. He also stated everyone had an opportunity to share their thoughts and opinions. The district court eventually denied Campbell's motion.

Generally, courts may not inquire into the mental process of a juror or factors that influence the mental processes of a juror in reaching a verdict. *Saucedo v. Winger*, 252 Kan. 718, 728-29, 850 P.2d 908 (1993).

> "A verdict may not be impeached by (1) questions as to a juror's views or conclusions, or
> (2) questions as to the reasons for those views or as to factors used in determining those

conclusions, or (3) questions involving what influences those views or involving factors which influence the mental process in reaching such conclusions." 252 Kan. at 728-29.

Additionally, under K.S.A. 60-441, when a court questions the validity of a verdict, it may not receive evidence "to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined."

In *Brown v. Hardin*, 197 Kan. 517, 419 P.2d 912 (1966), the plaintiff claimed the jury committed misconduct. In support, plaintiff pointed to two jurors who filed affidavits after the verdict. The affiants claimed that other jurors refused to consider the testimony of a rebuttal witness because they believed he had been "paid" to testify. Another juror also said the witness had been "bought off" and they could not consider his testimony. Our Supreme Court held these affidavits could not serve to invalidate the jury's verdict:

> "Clearly these affidavits related to matters occurring during the jury's deliberations which were an intrinsic part of the verdict, namely, expression of opinion on weight to be given testimony. There is no suggestion of extrinsic misconduct of any juror, no claim of personal knowledge on the part of any juror or no indication of outside influence as was true in cases relied on by plaintiff. Human nature being what it is, if every wild expression of opinion made in a jury room in the throes of hammering out a verdict could be made the basis for retrial jury verdicts could seldom be preserved. Such inquiries into the validity of jury verdicts, based on mental processes of the jurors, are foreclosed in Kansas, formerly by case law, now by statute." 197 Kan. at 523.

See also *Howell v. Calvert*, 268 Kan. 698, 704, 1 P.3d 310 (2000) (jury's conclusion that plaintiff was a "faker" was intrinsic to verdict and court could not consider as misconduct).

25

Most of D.E.'s claims fall within the prohibited territory of the mental processes the jury used to reach its verdict. The foreman's alleged belief that Campbell was a liar and his attempts to convince jurors of the same are clearly a matter of his views and what may have prompted others to adopt those views. Any speculation as to why Campbell's son did not testify similarly constitute an intrinsic part of the deliberations. M.M.'s statement made to the judge after deliberations arguably provides no insight on how the jury reached its verdict. Even if it did, it again would constitute M.M.'s own views in reaching a conclusion.

The only accusation of jury misconduct which is not intrinsic to the verdict is D.E.'s outside research on bolt strength. When a juror introduces evidence on a material issue of fact to the jury during deliberations and that evidence substantially affects the jury's verdict, a party's right to a fair trial has been denied. *Saucedo*, 257 Kan. at 733. After the collision, a bolt was missing from the front bumper of Detective Burley's SUV. The evidence at trial did not establish whether the bolt had broken in the collision or was already missing. The amount of force required to break a bolt presumably speaks to the amount of force generated by the collision. Assuming this was a material issue at trial, D.E. did not in fact introduce this extrinsic evidence during deliberations. As D.E., M.M., and B.B. all stated in their affidavits, a juror cut off D.E. before she was able to recite the findings of her research. Since D.E. never introduced the evidence to the jury, it is not clear how this information could have substantially affected the verdict.

The trial record demonstrates that the verdict in this case was not contrary to the evidence. Furthermore, the jury returned a negative finding in this case and such findings are generally not overturned on appeal. The district court did not abuse its discretion in allowing Dr. McMaster to testify regarding Campbell's MRI films, and even if it had, the error was harmless. Additionally, the district court did not abuse its discretion in allowing Dr. McMaster to testifying regarding forces generated by the collision in his causation

opinion because he was able to demonstrate he had sufficient qualifications to provide such an opinion. Furthermore, as an expert, he could rely on authoritative literature in conjunction with his personal knowledge in forming his opinion. Lastly, Campbell has not identified any jury misconduct which would invalidate the verdict in this case. Accordingly, we affirm the jury's verdict and the rulings of the district court.

Affirmed.

\* \* \*

ATCHESON, J., concurring:  I concur in the result affirming the jury verdict and judgment for Sedgwick County and against Trudy Campbell in this personal injury action.